Filed 5/8/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALIFORNIA CRANE SCHOOL, INC. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> NATIONAL COMMISSION FOR CERTIFICATION OF CRANE OPERATORS et al., <br><br> Defendants and Respondents. | F063727 <br><br> (Super. Ct. No. CV53859) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County. James A. Boscoe, Judge.

Alioto Law Firm, Joseph M. Alioto, Theresa D. Moore, Jamie Miller; Law Offices of Jeffery K. Perkins and Jeffery K. Perkins for Plaintiffs and Appellants California Crane School, Inc. and John Nypl.

Law Office of James M. Dombroski, James M. Dombroski; Law Offices of Jeffery K. Perkins and Jeffery K. Perkins for Plaintiffs and Appellants Timothy Maxwell, Jared Maxwell, Vladimir Nypl and Joshua Larsen.

Parsons Behle & Latimer, John N. Zarian and Brook B. Bond for Defendants and Respondents.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part II.A.1. of the Discussion and the Disposition are certified for publication.

# INTRODUCTION

California requires all crane operators to be certified. (Cal. Code Regs., tit. 8, § 5006.1.) Respondent National Commission for Certification of Crane Operators (NCCCO) is the only nonunion certifying entity in the state. To be certified, applicants must pass NCCCO's written and practical exams. NCCCO contracted with respondent International Assessment Institute (IAI) to develop and administer the exams.

Appellant John Nypl owns and operates appellant California Crane School, Inc. (CCS), a training facility for those seeking to pass NCCCO's operator certification exams. Nypl improperly obtained copies of NCCCO's secure exams and used them to train CCS's students. NCCCO sued Nypl and CCS. To settle the action, Nypl and CCS agreed to be subject to administrative sanctions that precluded Nypl from acting as a test site coordinator and practical examiner and barred CCS from being listed as a training facility on the NCCCO Web site. According to respondents, CCS and Nypl repeatedly engaged in conduct to circumvent the sanctions. According to appellants, after Nypl refused to join a price-fixing agreement with competing schools, most of whom control NCCCO, NCCCO and IAI blocked Nypl's legitimate attempts to operate CCS despite the sanctions. Appellants alleged that respondents' concerted refusals to deal with them constituted an illegal boycott.

Appellants sued respondents for Cartwright Antitrust Act violations (Bus. & Prof. Code,[1] § 16700 et seq. (Cartwright Act)), unfair competition and related business torts. The court sustained demurrers to the Cartwright Act and unfair competition claims and the jury found for respondents on the remaining interference with business relationships claim.

---

[1] Further statutory references are to the Business and Professions Code unless stated otherwise.

2.

Appellants appeal contending:  (1) the court erred in sustaining the demurrer because the complaint alleged an illegal group boycott;[2] (2) the court abused its discretion in refusing appellants sufficient time to put on their case; (3) the court erred in admitting evidence of appellants' misconduct that was "[r]eleased and [d]ischarged" pursuant to the settlement agreement; and (4) the court erred in instructing the jury in six regards.

We will set forth the trial evidence and address the trial issues first.  We will then address the order sustaining the demurrers.  We will affirm as to the trial issues; we will reverse the ruling on the demurrer to the antitrust causes of action.

## I.     FACTS AND PROCEDURAL HISTORY[*]

### A.     Procedural History

The trial court sustained respondents' demurrer to the antitrust violations alleged in the third amended complaint without leave to amend.  Subsequently, the trial court granted summary adjudication on the breach of contract cause of action and on the interference with contract and business relationships claims of all appellants except Nypl and CCS.  Nypl and CCS went to trial on their breach of contract and interference with business relationships claims against NCCCO and IAI only.  At trial, the court granted respondents' motion for nonsuit on the intentional interference with contractual relationships claim.  The jury, after deliberating for not quite a day, returned a verdict in favor of NCCCO and IAI on appellants' interference with the business relationships cause of action and judgment was entered accordingly.

---

**2**     Appellants do not challenge the trial court's decision to sustain the demurrer to their unfair competition and false advertising cause of action.

**\***     See footnote, *ante*, page 1.

3.

**B.     Trial Evidence**

**1.     The Parties**

Appellants are CCS; John Nypl, who owns and operates CCS; Timothy Maxwell, a friend of Nypl's who worked for CCS, whose application to be a NCCCO test site coordinator was denied; Jared Maxwell, Timothy Maxwell's son, who assisted Nypl at CCS and whose status as a test site coordinator and accredited practical examiner for NCCCO was suspended; Joshua Larsen, who assisted Nypl and operated AAA Crane School, and whose status as a test site coordinator and accredited practical examiner for NCCCO was revoked; and Vladimir Nypl, Nypl's brother, whose application to be a NCCCO accredited practical examiner was denied.

Respondents are NCCCO, a nonprofit industry organization that administers crane operator exams and certification programs in several states, including California; Graham Brent, the executive director of NCCCO, and Robert Hornauer, who is NCCCO's manager of test integrity; IAI, a for-profit company that assists in the development and administration of NCCCO's written and practical examinations, and IAI's president, Anthony Mitchell, Ph.D.

**2.     Crane Operator Certification**

**a.     Applicable regulations**

In 2005, pursuant to Labor Code section 142.3, subdivision (a)(1), the California Occupational Safety and Health Standards Board (Cal-OSHA) adopted California Code of Regulations, title 8, section 5006.1, which prescribes crane operator qualifications and certification.  To be certified, a crane operator must pass a written examination "developed, validated, and administered in accordance with [specified standards]," which tests the knowledge and skills necessary for safe crane operations.  A crane operator must also pass a practical examination to demonstrate proficiency in operating the specific type of crane for which certification is sought.  (Cal. Code Regs., § 5006.1, tit. 8, subd. (a)(3)

& (4).)  Certificates are valid for five years and crane operators must recertify every five years.  (*Id.*, subds. (b) & (d).)

Cal-OSHA does not certify crane operators.  Rather, it accepts crane operator certifications issued by NCCCO as sufficient evidence of compliance with its California Code of Regulations, title 8, section 5006.1 minimum proficiency requirements.

California Code of Regulations, title 8, section 5006.1, subdivision (c), specifies that an "Accredited Certifying Entity" shall issue the certificate of competency.  The regulation defines an accredited certifying entity as "any organization whose certification program is accredited by either the National Commission for Certifying Agencies (NCCA), or the American National Standards Institute (ANSI)."  NCCCO, which is accredited by NCCA and ANSI, is one of two accredited entities that issues certificates to operate commercial cranes in California pursuant to the Cal-OSHA regulations.  The other accredited entity issues certificates only to its labor union members.

To maintain their accreditation with ANSI, NCCCO is subject a rigorous annual audit of its certification process.

### b.      California Code of Regulations, title 8, section 5006.1

California Code of Regulations, title 8, section 5006.1, subdivision (a)(4), provides that crane operator certificates shall be issued to operators who "[p]ass a 'hands-on' examination to demonstrate proficiency in operating the specific type of crane, which at a minimum shall include pre-start and post-start inspection, maneuvering skills, shutdown, and securing procedures."

NCCCO does not test prestart and poststart inspections during the practical exam.  It tests those elements as part of the written exam.  While NCCCO does not comply with "the literal statement of the code," it follows the regulation as interpreted by Cal-OSHA.  NCCCO has worked closely with Cal-OSHA over the years.  Hornauer attends the monthly Cal-OSHA Standards Board meetings.  The Standards Board oversees the development and adherence to regulations in California.  NCCCO has never been told

that its testing program does not comply with California Code of Regulations, title 8, section 5006.1. Larry McCune, the Principal Safety Engineer for California, confirmed that NCCCO's testing program met the California requirement. Specifically, prestart and poststart inspections may be tested on either the practical or the written exam.

### c. NCCCO and IAI

NCCCO's primary mission is to improve the safety of crane operations. NCCCO, a nonprofit organization, has an unpaid nine member board of directors. The board develops the strategic plan for the organization, monitors the performance of its programs, approves the decisions of committees and task forces, and sets the testing fees for its exams. Board members are selected by NCCCO's commissioners. No crane school operators served as board members at the time of trial, but some commissioners were involved in crane operator training.

Pursuant to its by-laws, NCCCO's commissioners are composed of individuals associated with labor, crane users, crane manufacturers, owners, insurance companies, government, regulatory and standard setting agencies and the public. NCCCO has no members or shareholders. It is administered and managed by an executive director. Brent has been NCCCO's executive director since 1996.

IAI is a for-profit company that provides testing services. Mitchell has been IAI's president since 1997. Since 2002, IAI has provided testing services to NCCCO exclusively. IAI agreed not to provide testing services to any competitor of NCCCO. The services IAI provides include developing and maintaining the exams, accepting applications from candidates, establishing test sites, assigning proctors and chief examiners to administer the exams at the test sites, scoring the exams, providing the results of the exams to the candidates, and maintaining records of the candidates and their exam scores. IAI receives a portion of the testing fees each candidate pays to take the various exams. IAI charges additional fees for late or incomplete applications and cancellations, which IAI retains. IAI may refuse to score an exam, in consultation with

6.

NCCCO, if it suspects cheating or some other irregularity. IAI administers about 30,000 crane exams a year.

Neither NCCCO nor IAI are involved directly in the training of crane operators. NCCCO's and IAI's only interest in the specific courses offered by training providers is that the providers comply with NCCCO's policies and procedures. NCCCO lists approved training providers on its Web site. Placement on the NCCCO Web site is important to a crane training school.

NCCCO has volunteer subject matter experts from the crane industry who write the certifying exams. A very small percentage of them operate crane schools. Others involved in the NCCCO certification testing process include test site coordinators and accredited practical examiners. Test site coordinators act as liaison between NCCCO, IAI and the training provider in arranging the written and practical examinations. They collect candidate applications and ensure the test site is set up in compliance with NCCCO's requirements. NCCCO's test site coordinators agree, in writing, to prepare the test site in accordance with NCCCO's directions, to comply with NCCCO's policies and procedures, to remain at the test site throughout the exam, and to not disclose any confidential information they receive as a result of serving as coordinator.

The accredited practical examiners conduct practical exams in compliance with NCCCO's rules and policies, which are designed to keep the testing process standardized, fair and reliable. To become an accredited practical examiner, a certified crane operator must attend a three-day workshop where the practical examiner process is taught. NCCCO conducts the workshop and supplies the instructor and course materials at the workshop host's site. Usually, companies who want their employees or representatives accredited as practical examiners host the workshops. Once accredited by NCCCO, a practical examiner works independently. NCCCO does not set fees for the practical examiner's services. The fees are agreed upon between the examiner and the crane

operator candidate. For safety reasons, accredited practical examiners should be proficient operators with significant crane experience.

NCCCO is required under the terms of its accreditation by NCCA and ANSI to monitor the test site coordinators and accredited practical examiners. ANSI requires NCCCO to conduct surveillance on the training providers. One of the methods NCCCO uses to monitor quality control is to place a "secret shopper" at the test site. The secret shopper attends the training course and takes the exams as if he were a regular candidate without revealing his status.

NCCCO lists training schools or providers on its Web site as a public service. The schools listed are not a formal part of the NCCCO program. Generally, the only contact NCCCO has with training providers is if the providers act as test site coordinators or practical examiners.

### d.	Crane operator certification process

To obtain certification from NCCCO, a crane operator must pass the relevant NCCCO written exams. There is a basic core examination and a number of specialty examinations that focus on the operation of various types of cranes. NCCCO's exams are "[s]ecure." They are not intended to be shared with third parties. NCCCO does not administer the exams itself but contracts with IAI, which develops and administers the written and practical exams.

The process is as follows. A crane operator training school conducts the classroom preparation, which can last from several days to a week. At the conclusion of the classroom instruction, IAI sends an independent examiner to the class site to administer the written exam and return the completed exams to IAI.

The test site coordinator, who usually is an individual associated with the crane school or business conducting the training, acts on NCCCO's behalf. The coordinator is the point person at the test site. Generally, the test site coordinator collects the

8.

candidates' applications, arranges the testing site, and ensures the site is set up in compliance with NCCCO requirements.

While CCS and Nypl preferred to use their training classroom as the written test site for CCS students, there were many "open" written test sites available where CCS students could have tested throughout the state. In addition, the National Assessment Institute operated monthly open test sites in Fairfield, Bakersfield and Orange County where CCS students could test.

IAI's role in the testing process included processing the applications of candidates who applied to test at a particular place and time, preparing a roster of the test applicants and the exams they were taking, and shipping the roster and exams to a chief examiner. The chief examiner traveled to the test site, distributed the exams to the candidates, timed and proctored the exam, collected the completed exams and returned them to IAI, who scored them and reported the scores to the candidates.

The practical exams were generally scheduled after the written exams. The practical exam site coordinator scheduled the practical exams with an accredited practical examiner. The practical exam site coordinator then registered the candidates for the exam and insured the test course was properly equipped and arranged. During the practical exam, the accredited practical examiner observed the candidates operate the cranes in completing specified maneuvers and tasks, and timed and scored their performance on the NCCCO scoring form. At the conclusion of the exam, the practical examiner sent the candidate's application, testing fees and score sheet to IAI, who graded the exam. According to NCCCO, it is important the accredited practical examiners follow all rules and policies in order to keep the testing process fair and reliable.

For safety reasons, the practical examiners are experienced crane operators who have gone through NCCCO's three-day accreditation workshop. At the workshop, the candidates learn how to set up the test site, where the various items involved in testing are to be positioned, how to complete the score sheet, and IAI's and NCCCO's

9.

administrative requirements for submitting the score sheets. Neither NCCCO nor IAI pay the practical examiners. A small percentage of practical examiners may make their living by testing alone. But most examiners are connected with a construction company, a crane rental company, or a training program and serve as a practical examiner as part of their job.

### 3.     CCS

Nypl, a certified crane operator, had run CCS since 2004, the year before California implemented the regulation that required all crane operators to be certified. Most of CCS's students were already working in the crane field and needed the NCCCO certification to comply with the law. CCS offered a one-stop certification preparation process that included a three-day written and practical exam preparation course, a site to take the written exam, and a site to take the practical exam upon completion of the written exam.

CCS charged $1,795 for the three-day course and offered a guarantee to provide unlimited additional course work to persons who failed the written test at no additional cost. Historically, CCS's pass rate for the written test was between 85 and 90 percent, which was higher than the average pass rate. Other schools had longer training programs and charged about $2,000. Nypl designed the instructional programs and did most of the teaching for CCS at the University of Phoenix classrooms in Sacramento. As part of the classroom preparation, Nypl prepared sample test questions for CCS's students from materials he obtained from other training schools. Early on, CCS used Coastline Equipment's yard and equipment for the practical exams. Later, Nypl purchased the necessary cranes and equipment and used his own site for the practical exams.

Before September 2005, CCS was listed as a training provider on the NCCCO Web site, which was crucial to attracting students to the new business. In 2004 and 2005, CCS's business grew rapidly and Nypl recruited others to help him with the training and testing.

### 4. Nypl Pays for NCCCO's Secure Exams

In February 2005, Nypl paid IAI chief examiner Mona Perrine $700 for NCCCO's written exams. Nypl incorporated the exam questions into the CCS exam preparation materials. Asked at trial how he felt about buying the tests, Nypl responded, "I probably shouldn't have done it. As … they weren't of much help to me. Our pass rates were pretty much the same before and after.… It was an opportunity that I now definitely regret doing and putting myself in this type of situation with it."

Robert Curtis, who worked for CCS at the time, witnessed the transaction between Nypl and Perrine and became concerned about Nypl's business practices. Curtis had seen Nypl post test answers on a calendar in the test site location, without the knowledge of the independent examiner, and saw Nypl coach non-English speakers with the actual test answers to enable them to pass the test. Curtis resigned his employment, notified NCCCO of the situation and provided materials to support his allegations. Among the materials he provided were CCS course materials that included NCCCO exam questions that were exact matches down to punctuation and spelling errors.

When Mitchell of IAI confronted Perrine about the incident, she was devastated and contrite. She provided a declaration in which she admitted she sold NCCCO's current core examination and an additional examination to Nypl because she "was desperate for money."

### 5. The Federal Actions and Settlement Agreement

NCCCO's board of directors found Nypl's purchase of their secure exams and his using them to teach the test "egregious," and believed "the damage could be quite significant [to] the entire program." NCCCO sued Nypl and CCS for copyright infringement and misappropriation of trade secrets. The case was settled quickly by agreement of the parties in September 2005. As part of the settlement, Nypl and CCS agreed to administrative sanctions that included: NCCCO cancelled the written test administrations then scheduled for CCS students and would refuse Nypl's future requests

11.

to administer written exams for CCS students. In addition, NCCCO removed CCS from the list of training providers on its Web site, suspended Nypl and CCS from acting as test site coordinators, suspended Nypl's status as an accredited practical examiner, and barred CCS from using any form of NCCCO's logo in its materials. NCCCO agreed that within a year, provided Nypl had not violated the settlement terms or injunction, NCCCO would reinstate CCS to the list of training providers on the NCCCO Web site, Nypl and CCS could apply for reinstatement as test site coordinators, and Nypl could apply for reaccreditation as an NCCCO practical examiner.

CCS and Nypl also agreed that NCCCO's representatives could, without notice, monitor and inspect CCS's test preparation seminars and teaching materials to insure he was not using unauthorized NCCCO materials. And the parties agreed that the federal district court would enter a permanent injunction restraining CCS and Nypl and their employees, agents and representatives from engaging in a number of activities related to the test materials and from the unauthorized use of NCCCO's trademarks.

Mitchell and Brent understood that the settlement agreement barred Nypl from hiring people to do the things the settlement agreement precluded him from doing. And, IAI's Test Site Coordinator Agreement, which every applicant to be a test site coordinator was required to sign, stated, "I am acting on my own behalf and/or on behalf of the company or organization set forth below, and not acting to circumvent a prior NCCCO suspension or revocation." The purpose of that statement was to make sure that individuals subject to discipline would not simply turn over the responsibilities to their secretary and continue to act as test site coordinators. It did not occur to Brent that the sanctions would leave Nypl and CCS without access to test site coordinators and accredited practical examiners for their students because there were many coordinators and examiners available at the time.

12.

The parties disagreed as to whether each side had complied with their obligations under the settlement agreement and permanent injunction. The details of those disputes are set forth below.

Three years later, in 2008, after appellants filed this action, NCCCO filed a second federal action asserting claims for breach of the settlement agreement and violation of the permanent injunction. When Nypl was served with that complaint, he directed his Web site person to stop redirecting traffic from a number of domain names that included "CCO" to the CCS Web site. Nypl had hired Larsen to renew domain names that Nypl was barred from using, in violation of the settlement agreement. The federal court found CCS had violated the permanent injunction by retaining the use of 14 domain names associated with NCCCO. Therefore, NCCCO was not obligated to reinstate CCS to its Web site. Nypl testified that his breach of the settlement agreement was inadvertent. His "web guys" were responsible.

### 6. Postsettlement Agreement Events

Shortly after the settlement agreement was signed, NCCCO was concerned that Nypl was violating the agreement terms by his behavior at test sites and his hiring of surrogates or proxies to perform the things he could not do under the settlement agreement. Mitchell believed Nypl was hiring people who did not have the requisite background as crane operators, was helping them pass the written and practical exams, and then helping them become accredited practical examiners when they did not have the background or skills to perform that function.

According to Mitchell, IAI had no problem with some of the individuals Nypl hired to be practical examiners for CCS students because they performed with "legitimacy." Other individuals, however, received more scrutiny because many had never been crane operators. Nevertheless, with Nypl's assistance, they had passed the exams to be certified crane operators and wanted to be accredited as practical examiners with no actual crane operator experience. There was a concern that inexperienced

13.

individuals would not maintain the integrity of NCCCO's program. Those inexperienced individuals included appellants Joshua Larsen (Larsen), Tim Maxwell (Tim), Jared Maxwell (Jared), and Vladimir Nypl (Vladimir).

Nypl understood he could continue to operate CCS as he had before the settlement agreement, but he could not serve as a test site coordinator or a practical examiner. He also could not use the NCCCO acronym in his advertising and CCS would no longer be listed on the NCCCO Web site. Nypl's initial solution to these limitations was to have Larsen start AAA Crane School to serve as the testing arm of Nypl's CCS training operation. Larsen, a cabinet maker, had no prior crane experience, but had attended CCS, had become a certified crane operator and an accredited practical examiner, and was assisting Nypl at CCS in 2005. Larsen set up AAA Crane School and had it listed as a training provider on the NCCCO Web site. The address for AAA Crane School was a post office box in a UPS store and the AAA Crane School Web site registration page directed candidates to send their $1,795 tuition payment to CCS. Nypl then merged CCS and AAA Crane School into "one classroom." The majority of the customers were Nypl's. Nypl did the training and Larsen handled the testing.

In September 2005, shortly after the settlement agreement was signed, Larsen faxed IAI the applications from a number of candidates at AAA Crane School scheduled to take the NCCCO written examination. Larsen told IAI that AAA Crane School was not connected to CCS. However, the applications were faxed by Annie Nypl, Nypl's wife who served as bookkeeper for CCS, and the testing fees were paid by CCS. According to Mitchell, after Nypl was suspended, Larsen took over CCS, renamed it AAA Crane School and used the same Web site, but told Mitchell that AAA Crane School was totally separate from Nypl and CCS.

In addition to the blurred distinction between CCS and AAA Crane School, other issues arose with Larsen's performance. In May 2006, Larsen, as the test site coordinator, had scheduled a written exam. When IAI's chief examiner arrived to

14.

administer the exam, Larsen was not at the site.  Instead, Nypl was in the classroom doing a course review with the candidates and the room was not set up for testing. Mitchell told Larsen that, as test site coordinator, he must insure the chief examiner can enter the room and administer the test at the time it is scheduled.  Mitchell also told Larsen it was inappropriate to do training at the same time that testing was scheduled. Larsen felt that preparation just before the test was "'very appropriate,'" and was not willing to leave the test room when the test was ready to begin.

Hornauer also found problems with Larsen's practical exam site.  According to Nypl, the problems were manufactured because Hornauer inspected the site when it was not set up for testing.  According to Brent, Larsen's status as a practical examiner was revoked because, among other things, he twice conducted practical exams using cranes that had not been certified as required by Cal-OSHA and NCCCO, he did not set up the test sites properly, he used inappropriate load materials during the exams, and he left the CCS logos on the exam cranes. When Larsen's status as a practical examiner and test site coordinator was revoked, Larsen quit working with Nypl and AAA Crane School no longer operated.

When Larsen was no longer able to test for Nypl, Nypl asked Tim to serve as a test site coordinator and to become an accredited practical examiner.  Tim trained and tested with Larsen and met the certification requirements, but NCCCO refused to certify him. In June 2006, IAI received a request from Tim to be a test site coordinator at the University of Phoenix in Sacramento, the same place and on the same schedule that Nypl and Larsen had used for written exams they had scheduled for CCS and AAA Crane School.  NCCCO/IAI denied Tim's application because he "lied to [NCCCO and IAI on] not knowing Josh Lars[e]n" and because he "was hired to be a test site coordinator[, but] would not say by whom."  Subsequently, NCCCO wrote Tim describing the steps he must take to be a certified crane operator and eligible to attend an accredited practical

examiner workshop.  By the time of trial, Tim was free to act as a test site coordinator, but had not signed the written test site coordinator agreement.

Jared, Tim's son, assisted Nypl with CCS.  He served as a test site coordinator and practical examiner.  While Jared was acting as a test site coordinator, IAI received a number of complaints from its chief examiners that Nypl and some of his other trainers were interfering with the testing process.  Mitchell wrote Jared that IAI would suspend his ability to act as test site coordinator unless he insured that no training occurred on the day of the written exam, that no trainers remained on the site during testing, that Nypl did not serve as test site coordinator, and that he remained out of the testing room when the "live exams" were present absent the express request of the chief examiner.  Further, if the chief examiner saw Nypl on the test site, the examiner would discontinue the exam.  Eventually, NCCCO suspended Jared for a year from acting as a test site coordinator and accredited practical examiner because of issues with the cranes he was using for the practical exam.  Jared had conducted practical exams on cranes that NCCCO had asked him not to test on because they were unsafe.  At the time of trial, Jared was free to act as test site coordinator.

Vladimir, Nypl's brother, worked as a firefighter.  While he had operated Nypl's cranes a few times, he had not worked as a crane operator.  According to Nypl, Vladimir completed all the training and testing necessary to be a certified crane operator and an accredited practical examiner, but NCCCO denied him accreditation without cause.  According to Mitchell, IAI staff reported Vladimir had demonstrated at a practical examiner accreditation workshop that he was not a crane operator.  He had scored 10 out of 100 on one practical exam and 29 on another.  A short time later, he retook the tests under the auspices of CCS or AAA Crane School and received scores of 90 or above.  Because of the score discrepancy, NCCCO told Vladimir he had to retest—at their expense—but he did not.

16.

By the summer of 2006, Nypl could not find an accredited practical examiner, who was available to test CCS students when needed. While scheduling presented a challenge, so did the price the available accredited practical examiners charged. Nypl could not use their services and continue to charge the same price he had been for his courses and he was not willing to pay the amount they charged.

According to Mitchell, of the nine other individuals CCS paid to perform various duties after 2005, eight were never disciplined by NCCCO or IAI. NCCCO and IAI did not suspend or revoke anyone's status as tester simply because they were associated with or knew Nypl. Rather, Mitchell's motivations were to ensure that the individual was not a party to a breach of the settlement agreement or in violation of the permanent injunction, and that NCCCO's certification program was conducted with integrity and in adherence to the standards that govern the testing industry.

In addition to problems with Nypl's test site coordinators and practical examiners, Nypl did not accept the additional monitoring gracefully. In October or November 2005, Hornauer, NCCCO's manager of test integrity, traveled to CCS to monitor Nypl's teaching. Nypl made rude comments to Hornauer while he monitored Nypl's class. Nypl objected to Hornauer's presence, questioned his authority to be there, and complained he was disrupting the class. Hornauer replied that Nypl was the one being disruptive and Nypl should treat him like a fly on the wall. Nypl replied he was too big to be a fly and if a fly was in the room, he would smack it with a fly swatter. Hornauer left the classroom so the class would not be disrupted further. On another occasion, during classroom instruction, Nypl made disparaging remarks about IAI and NCCCO, including that they charged "for every little thing." Nypl then wrote out an invoice for auditing the class, which included a "sitting fee" and oxygen use fee and handed it to Hornauer.

**7.      One-year Review Pursuant to Settlement Agreement**

In August 2006, as the one-year anniversary of the settlement agreement approached, NCCCO prepared to review Nypl's and CCS's compliance with the terms of

the permanent injunction as required by the agreement. Brent asked Mitchell and Hornauer for a summary of their experiences with appellants.

Hornauer reported 18 "indiscretions" related to the settlement agreement. The incidents included the following. In May 2006, IAI received an inquiry from a candidate asking why he had not received his practical exam scores for an exam he had taken eight months earlier at Nypl's test site. When the candidate inquired of Nypl, Nypl faxed the candidate's score sheet and another candidate's score sheet to IAI. IAI already had an original score sheet for the other candidate and it did not match the faxed copy. In addition, the score sheet indicated the various crane exams had occurred on the same site, while the candidate said he had tested on different cranes at different sites.

In July 2006, Mitchell received a phone call from Claude Dixon regarding a test site application IAI had received for a written exam on July 14, 2006. Dixon explained that he was a 77-year-old retired attorney, and was looking for a way to make some money. He had never worked with cranes, but had a casual conversation with "'a nice young' man" in Grass Valley, where Nypl lived, who suggested he could be a test site coordinator. Dixon did not know the name of the young man. When asked why he had requested the July test date, he said that must be a mistake because he would be delivering a paper in Philadelphia that day. Mitchell suggested he check the role of a test site coordinator on the NCCCO Web site. Mitchell did not hear from Dixon again.

On several occasions during the year, Nypl was still conducting his preparation course when the IAI chief examiner arrived to set up the room for testing, which caused the exam to start late. In addition, Nypl would remain on the test site and meet with the candidates after the exams, attempting to "harvest" questions from the candidates. He also acted as test site coordinator despite his suspension.

In December 2006, Nypl and his legal counsel attended the NCCCO board meeting at which his compliance with the settlement agreement and possible reinstatement were considered. According to board member Chris Ryan, Nypl was

combative and antagonistic at the meeting. He acted as if he had done nothing wrong and did not understand what the big deal was. The board was disinclined to reinstate Nypl, but proposed in a March 2007 letter, a six-month probationary period during which time CCS could serve as a written exam test site, Nypl could act as a test site coordinator for CCS, and CCS could be listed on NCCCO's Web site as a training provider. The board's approval was conditioned on Nypl agreeing to comply with all of NCCCO's and IAI's terms and conditions. At the end of the six month period, if Nypl fully complied with NCCCO's policies and procedures, he would be reinstated.

### 8. Six-month Probationary Period

Nypl agreed and as the six-month probationary period drew to a close, applied to host a three-day practical exam accreditation workshop in September 2007. Nypl, as host, provided the physical facilities—the training room, cranes and practical test site— necessary for the instruction and testing. NCCCO provided the instructor, the training program and the materials.

The workshop instructor, Danny Thiemens, reported the workshop was plagued with delays from the start. The group had to travel about nine miles from the practical exam site to the classroom for that part of the training. Once they reached the classroom, Nypl and Tim, who were attending the workshop, refused to sign the noncompetition and confidentiality agreement that were part of the required paperwork. Thiemens scheduled a class break and called the NCCCO regional office, who told him to exclude the men until they signed the agreements. The men were excluded until early afternoon when they agreed to sign the forms "under duress." Once readmitted to the classroom, Nypl questioned Thiemens on almost every point and policy he explained. As a result of the delays, the workshop was about three hours behind schedule.

Eventually, the classroom portion was completed and the workshop candidates moved to the practical exam site in the late afternoon. There were mistakes in the exam site layout and the two test cranes appeared to have problems. Nypl assured Thiemens he

19.

would make corrections. When Thiemens returned to his hotel that evening, two workshop candidates voiced concerns to him about the mechanical condition of the cranes on the test site. The next morning, additional defects came to light. When Thiemens pointed out specific concerns to Nypl regarding one crane, Nypl began to operate that crane through the test course in a rapid and unsafe manner. Thiemens called Brent at NCCCO, who told him to stop the workshop, which he did. Nypl became irate, put a microphone in Thiemens's face and peppered him with questions in a very aggressive manner. Thiemens left the site and prepared a report of the events pursuant to Brent's request.

That same day, Nypl called Dave Shelly, a Cal-OSHA licensed crane inspector, to inspect the cranes that Thiemens had deemed unsafe. Shelly told Nypl that the crane with the dented boom had to be inspected by the manufacturer to determine whether it was safe to use. The second crane appeared to be leaking hydraulic fluid and the brakes were not working. The cranes were not safe to use for testing.

Three months later, NCCCO asked Shelly to reinspect the cranes to see if they were safe for testing. The crane that previously had the dent in the boom no longer did and it appeared to have been freshly painted. When Shelly asked about it, Nypl replied, "it's just the way it was." The second crane with the hydraulic leak had not been cleaned and the brakes were still "caged." Because Nypl had not had the crane with the dented boom inspected and declared safe by the manufacturer, the cranes were still unsafe to use for testing.

According to appellants, the workshop site problems were manufactured. To establish this motive, appellants called Danny Matranga. Matranga operated a crane company in Sacramento. In 2005, Nypl offered to train Matranga's crane operators in exchange for using Matranga's crane and yard for the practical exam for CCS students. Matranga agreed and became an accredited practical examiner for NCCCO. As a practical examiner, Matranga and the practical exam site were subject to NCCCO

20.

auditing. One auditor told Matranga that NCCCO wanted to find something wrong with the test site, NCCCO was out to get Nypl, and Matranga would be subject to more stringent rules because of his association with Nypl. Matranga also was told that NCCCO had candidates at Nypl's practical examiner workshop who had been instructed to find things wrong with the workshop so it could be shut down.

### 9. NCCCO Refuses to Reinstate Nypl and CCS

The NCCCO board members decided to postpone their decision about Nypl's probationary status until the next meeting in December 2007 so they could consider his conduct at the September workshop. Brent invited Nypl to provide information he wanted NCCCO to consider.

Nypl attended the December meeting with his attorney and two students who had attended CCS. He spoke "at length" in support of his applications for reinstatement as a test site coordinator and an accredited practical examiner, and for the inclusion of CCS as a training school on NCCCO's Web site. The two students had recently completed crane school and wanted to become accredited practical examiners. According to board member Chris Ryan, one of the students had no prior crane experience and drove a Coca-Cola truck. Ryan felt the two students should not have been certified as crane operators—let alone be accredited as practical examiners. Practical examiners needed to be experienced certified crane operators for safety reasons.

The board members voted to deny Nypl's applications and notified him of their decision in January 2008. They did so to preserve the safety and integrity of NCCCO's program; they did not intend to interfere with his business relationships.

NCCCO's problems with Nypl did not end there. In 2009, he had Natalie Scistoonoff, who was performing secretarial services for CCS, submit an application for Pennsylvania Crane School to be listed on the NCCCO Web site. Scistoonoff signed the application with her name and someone else wrote "Rep" on the title line. Nypl owns a Nevada company that owns Pennsylvania Crane School. Tara Whittington, who works at

NCCCO and received the application, noted that the address on the documentation did not match the address on the form and asked Scistoonoff to explain the discrepancy. Whittington also asked if any representatives of Pennsylvania Crane School lived in Pennsylvania. Scistoonoff did not know the answer to those inquiries so she forwarded the email to Nypl. Whittington did not hear back from Scistoonoff or Nypl.

Whittington also received an application from ACA Pennsylvania Crane School to be listed on the NCCCO Web site. The application was signed by Scistoonoff as representative of the company. The address on the business license for the company did not match the address listed for the business on the application submitted to NCCCO. Whittington performed a search and learned that Nypl owned the ACA Pennsylvania Crane School domain name.

Whittington was also responsible for trademark monitoring—ensuring that the NCCCO logo and acronym were used in accordance with NCCCO's use policy. She discovered 14 URL's that said something like "CCO training" (the shorter version of the acronym that people frequently used to refer to NCCCO) that went directly to CCS's Web site.

### 10. Jury Findings

By special verdict, the jury found that CCS and Nypl had existing relationships with one or more practical examiners and/or test site coordinators that probably would have resulted in an economic benefit to them, that IAI and NCCCO knew of the relationships, and that neither IAI nor NCCCO intended to disrupt the relationships. Because the jury's finding that respondents did not intend to disrupt the relationships ended their deliberations, they did not consider whether respondents engaged in wrongful conduct that disrupted the relationships or whether any of respondents' defenses applied to appellants' claim.

22.

## II.  DISCUSSION

### A.  Trial Issues

#### 1.  Limiting Trial Time

According to appellants, the court decided, unilaterally and over the objections of both parties, to limit the trial to 10 days.  As a result of the unreasonable time limit, appellants were unable to call all of their witnesses or present rebuttal evidence, and were thus deprived of a fair trial.  (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677.)  According to respondents, the court provided ample warning that the trial would be scheduled as it was and merely exercised its inherent authority to reasonably control the proceedings.  (*Ellis v. Roshei Corp.* (1983) 143 Cal.App.3d 642, 648-649.)  We find no abuse of discretion or deprivation of a fair trial.

##### a.  Relevant facts

Appellants' time estimate in their pretrial brief was four to six weeks.  But, during pretrial discussions, the court told the parties that trial should last no more than nine or 10 days.  The court reasoned that pretrial rulings had narrowed the issues and reduced the case to Nypl's and CCS's two related interference causes of action against NCCCO and IAI.  Appellants' counsel replied that nine days was "optimistic," but made no comment in response to the court's concluding statement, "given the narrowing of the issues here, I think we can do it in that time.  So that's going to be the target; nine to ten days, okay."

When the court ruled against appellants on an in limine motion, they reported they would need an additional half or full day to respond to the evidence respondents were permitted to introduce from the federal court proceedings.  The court agreed to a 12-day trial.

Counsel for appellants slow pace was apparent from the start.  Appellants' counsel argued during opening statement, for which the court admonished him, and he exceeded the allotted time for opening statement.  At the end of the first day of testimony, respondents' counsel expressed concern that appellants had not completed even one of

23.

their 30-some proposed witnesses. Appellants' counsel replied that the first witness was always longer and appellants had only three "major" witnesses: Mitchell, who was on the stand, Brent, and Nypl. The court reiterated that the trial would last 12 days total, divided between the two sides.

Later, the parties agreed respondents would "get the case" on the morning of the eighth day of trial. Subsequently, they agreed respondents would get the case at noon that day. Late on the afternoon of the seventh day of trial, when appellants were examining Nypl and indicated they had additional direct examination for the next morning, the court stated they were "kind of under the gun tomorrow." Respondents argued that appellants were taking three and four times their time estimates to examine their witnesses. Appellants stated they were doing their best, but needed more time to put on their witnesses.

The court concluded, "I think you guys should have thought about this when you spent two-and-a-half days on Mr. Mitchell …. I mean that seems to be excessive considering the amount of time you guys agreed it would take to put your case on. I gave you two extra days and you used two-and-a-half days on one witness. It doesn't make me particularly sympathetic to your plight. [¶] So I'm going to stick with my schedule. I told you it wasn't chiseled in stone. I'm going to see what happens. But tomorrow at noon I want [respondents] to have their case." Counsel for appellants asked if they should have all of their witnesses present the next morning. The court responded, "You should have as many as you think you can get on between now and noon tomorrow."

On the morning of the eighth day of trial, appellants completed their direct examination of Nypl and respondents spent the rest of the morning cross-examining him. Appellants were permitted to call an additional expert witness that afternoon, and a final witness, Danny Matranga, on the afternoon of the ninth day of trial.

On the morning of the 10th day of trial, the court granted respondents' motion for nonsuit on appellants' interference with contract claim and denied it as to the interference

with business relationships claim. The court told the parties the case had to go to the jury the next day or they would lose a juror who had a planned vacation. Respondents continued with their case. That afternoon, respondents' counsel protested that appellants' counsel was taking more time cross examining respondents' witnesses than respondents were taking with direct examination. Appellants' counsel protested that was not true and the court completed the discussion off the record.

When additional juror scheduling problems came to light, the parties agreed to limit closing argument to one hour each. Before the case went to the jury, appellants objected that they had not been permitted to rebut respondents' evidence, which they could have rebutted. It also came to light that appellants had not moved certain exhibits into evidence. The court asked why they had not moved them into evidence before they rested. Appellants' counsel replied, they had not rested because "we had Hornauer." The court replied, "You testified [*sic*] when I told you your last witness was done, I told you you were not going to put him on if your last witness was Mr. Matranga, and you didn't move him into evidence."

The case was argued to the jury late on the afternoon of the 11th day of trial and the jury deliberated and reached a verdict on the 12th day of trial.

### b.      Rationale

Judges who preside over trials, especially jury trials, wear many hats and have numerous responsibilities. In addition to ruling on all questions of law and procedure, and sometimes deciding factual issues, they are responsible for ensuring the security of those who appear in court, that attorneys meet certain professional and ethical standards of behavior, that court staff fulfill their responsibilities, that juries are properly cared for and that all court cases assigned to them are fairly and efficiently heard and decided. It is these last two functions that are at issue when a trial judge imposes trial time limits.

Some litigants are of the mistaken opinion that when they are assigned to a court for trial they have *camping rights*. This view presumes that the trial judge must defer to

25.

the lawyers' time estimates for the conduct of the trial such that, for example, when examining witnesses, unless a valid objection is made by one's opponent, a party is entitled to take whatever time it believes necessary to question each witness. This view is not only contrary to law but undermines a trial judge's obligation to be protective of the court's time and resources as well as the time and interests of trial witnesses, jurors and other litigants waiting in line to have their cases assigned to a courtroom.[3] The Evidence Code expressly empowers trial judges to limit the presentation of evidence, even evidence that is relevant and probative. Evidence Code section 352 authorizes the court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate *undue consumption of time*. Evidence Code section 765, subdivision (a) provides that the court *shall* exercise control over the mode of interrogation of witnesses "so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of truth .…" Both statutes describe powers that the court may exercise on its own initiative.

It is incumbent upon trial judges to manage trials efficiently. Efficiency is not necessarily measured by comparing the actual length of a trial with the parties' original time estimate because parties often overestimate or underestimate a trial's length. Judges need to be proactive from the start in both assessing what a reasonable trial time estimate is and in monitoring the trial's progress so that the case proceeds smoothly without delay.

---

[3] The Trial Court Delay Reduction Act was enacted to encourage prompt disposition of all matters coming before the courts. (Gov. Code, § 68600 et seq.) Standard 2.1 (a) of the California Standards of Judicial Administration provides: "Trial courts should be guided by the general principle that from the commencement of litigation to its resolution, whether by trial or settlement, any elapsed time other than reasonably required for pleadings, discovery, preparation, and court events is unacceptable and should be eliminated." Canon 3B(8) of the California Code of Judicial Ethics provides: "A judge shall dispose of all judicial matters fairly, promptly, and efficiently. A judge shall manage the courtroom in a manner that provides all litigants the opportunity to have their matters fairly adjudicated in accordance with the law."

A trial department that goes *dark* because the parties have *run out of witnesses* for the day is an example of an unwarranted delay. Witnesses should be available at all times.[4] It is clearly preferable to inconvenience one or more witnesses standing by in the hallway than to bring a trial to a halt because no witnesses are available. When a trial stops for that reason, it adversely impacts the time and resources of the court, jurors, parties and attorneys, not to mention those litigants waiting for a courtroom to open up for their case. Trial time management is an ongoing responsibility of the trial judge, regardless of the case's complexity, the number of witnesses called or whether specific time limits have been imposed.

### c. Procedure

For those cases in which the trial judge believes time limits should be set, the court should first elicit estimates from the parties and invite each side to comment on the other's estimate. Once the parties have presented their views, the court should independently evaluate the estimates based on the arguments of the parties, the state of the pleadings, the legal and factual issues presented, the number of witnesses likely to testify, the court's trial schedule and hours, and the court's experience in trying similar cases.

Time limits may be stated in terms of court *days* or court *hours*. One difficulty with using court days is that the length of time that a court is in session on any given day may vary depending on unanticipated interruptions or delays (e.g., juror tardiness, matters taken up outside the presence of the jury, other court business that interrupts the trial, etc.). Thus, one trial day may include six hours of testimony while another trial day may include only four hours. When court days are used, a portion of one party's time limit includes the time its opponent takes to cross examine the first party's witnesses.

---

[4] Some trial judges admonish parties at the outset that if they run out of witnesses, it is the equivalent of *resting*.

27.

Theoretically, a party's opponent could use up a substantial portion of the other party's time limit through lengthy cross-examination.

There are advantages to specifying time limits in court hours rather than court days. An hour time limit imposed on one side would include all time that party spends in examining its own witnesses (direct and redirect) as well as time spent in examining the adverse party's witnesses (cross and recross). It would include the time spent in delivering an opening statement and final argument. As contrasted with a time limit expressed in court days, an hour limit, as described, is not diminished by matters beyond the party's control, such as the amount of time an opponent uses to cross-examine said party's witnesses.[5] An hour time limit does carry the additional burden of requiring a timekeeper (judge or clerk) to keep an accurate account of the time spent by each side. The parties are entitled to be kept advised on a regular basis and upon request of how much time each side has used and has remaining.[6]

Regardless of whether court-imposed time limits are expressed in days or hours, any time limit order should be reasonable, mindful that each party is entitled to a full and fair opportunity to present its case. Trials are a dynamic process without the benefit of a dress rehearsal, which makes forecasting the length of a trial less than precise. But for those parties and attorneys who are fully prepared for trial and don't waste time with repetitive questioning, cumulative evidence, not having witnesses available, or not having

___

[5]    If a plaintiff heedlessly exhausts its time limit during its case-in-chief, then it will have no time to cross-examine the defense witnesses. Similarly, if a defendant exhausts its time limit during its case-in-chief, then it will have no time to cross-examine any of the plaintiff's rebuttal witnesses.

[6]    Of course, for purposes of advising the jury of the estimate time for their jury trial service, the trial judge would have to include, in addition to the time limits imposed on the parties, the estimated times for jury selection, anticipated hearings outside their presence, reading of jury instructions, jury deliberation, the number of hours each day that the trial will be in session, etc.

documentary evidence organized and easily accessible, a trial's length is not an issue. Thus, despite the vagaries of trial, when all parties try a case diligently, there is no reason for time limits. In all other cases, time limits will provide incentive to be diligent.

Any limits imposed should be subject to revision (upward or downward) for good cause shown either on a party's or the court's own motion. For example, if one party decides not to call several witnesses on its original list or abandons some of its claims or defenses, or if the court dismisses some of a party's claims or defenses, the court would be justified in reducing that party's time allowance. On the other hand, if an unanticipated trial event causes a party to call additional witnesses not originally scheduled to testify, then the court would be justified in increasing that party's time allotment *provided* the court was given timely notice of the request, found that party's claim of surprise credible, determined that its surprise was not the result of inattention or lack of preparation and concluded that said party had otherwise managed its case in a diligent manner.

Not all cases are suitable for the imposition of time limits. More often it is sufficient if the trial judge manages the trial in such a way that the trial proceeds efficiently without delays, repetition or dead time. However, in those cases in which the trial court imposes time limits, it is also important that those limits be enforced. If it appears that a party's allotted time may expire while it is still presenting evidence, the court and counsel should discuss ahead of time how the matter will be handled in front of the jury. The court should give counsel the choice of either allowing counsel to announce that its client has "rested" or having the court inform the jury that said party has exceeded the time limits imposed by the court and therefore it may not present any additional evidence. It would be potentially prejudicial to one side who abided by the time limits if

the court were to relax the limits for the other.  Courts should not make orders they are not willing to enforce.[7]

### d.     The law

A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it.  (*People v. Engram* (2010) 50 Cal.4th 1131, 1146; Code Civ. Proc., § 128.[8])  This authority includes the power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings.  (*Ellis v. Roshei Corp.*, *supra*, 143 Cal.App.3d at pp. 648-649.)  In this vein, the court has the power to expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact.  (*Germ v. City & County of San Francisco* (1950) 99 Cal.App.2d 404, 424.)  But a court need not wait until a trial has been unduly prolonged before it takes measures to expedite the proceeding.  We believe it is clearly within the power of the court to impose time limits before the trial commences.  Finally, the court is vested with discretion over the scope of rebuttal, and its ruling will not be disturbed on appeal absent an abuse of discretion.  (*Ray v. Jackson* (1963) 219 Cal.App.2d 445, 454.)

However, the court must permit a party to have his day in court.  Denying a party the right to testify or offer evidence deprives him of a fair trial and constitutes reversible

---

[7]     Just as it would be improper to comment on a court's evidentiary ruling, it would be improper for counsel to comment on the court's time limit order in front of the jury.

[8]     The federal courts likewise recognize and approve a trial court's authority to set reasonable time limits for the conduct of a trial.  "Trial courts have broad authority to impose reasonable time limits.  [Citation.]  Such limits are useful to 'prevent undue delay, waste of time, or needless presentation of cumulative evidence.'  [Citation.]  While trial courts have discretion to expedite the completion of trials, 'they must not adhere so rigidly to time limits as to sacrifice justice in the name of efficiency.'  *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1509 (9th Cir. 1995)."  (*Navellier v. Sletten* (9th Cir. 2001) 262 F.3d 923, 941-942.)

error. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 (*Carlsson*.) In *Carlsson*, the trial court erred by abruptly ending the trial in the middle of a witness's testimony during the appellant's case-in-chief and without giving him an opportunity to complete the presentation of evidence or offer rebuttal evidence. (*Ibid.*; accord, *Bole v. Bole* (1946) 76 Cal.App.2d 344, 346 [court erred by refusing to require the plaintiff wife to bring son to testify as a witness for the defendant husband and in excluding evidence tending to show the character of the husband's mother-in-law, which would have supported his refusal to permit her into his home]; *Fewel v. Fewel* (1943) 23 Cal.2d 431, 433 [court erred by modifying a custody order based on the bare recommendation of the court investigator and precluding the plaintiff from cross-examining the investigator or presenting evidence]; *Kelly v. New West Federal Savings*, *supra*, 49 Cal.App.4th at p. 677 [court erred in granting motions in limine that prevented the plaintiffs from offering evidence to establish their case].)

### e.    Analysis

The trial court did not abuse its discretion in controlling the trial proceedings as it did. The case went to trial on only Nypl's and CCS's two related business interference tort claims against NCCCO and IAI. The trial court reasonably set aside nine to 10 days for trial and notified both sides of this time frame. While appellants stated the time frame was "optimistic," they did not object or provide any rationale why the trial could not be completed within that time period.

Further, the reasonable inference from the record is that appellants were unable to present rebuttal evidence because they did not manage their case-in-chief in a manner that permitted time for rebuttal. Appellants called Mitchell, IAI's president, as their first witness. After a full day of direct examination, counsel stated he had "about an hour or maybe more," thus suggesting that additional witnesses would be called the next day. However, appellants kept Mitchell on the stand for an additional two days and did not examine their second witness, Brent, until the morning of the fourth day of testimony.

31.

Brent was on the stand for two days before appellants called their third witness, Nypl, on the seventh day of testimony. They completed Nypl's direct examination on the morning of the eighth day of testimony and respondents began their case in chief at noon that day. Appellants thus spent almost seven days examining three witnesses.[9] In addition, appellants were permitted to call an expert witness briefly on the afternoon of the eighth day, and a final witness, Matranga, on the afternoon of the ninth day of trial. By way of comparison, respondents began their case-in-chief on the afternoon of the eighth day and the case went to the jury late on the 11th day of testimony.

Appellants submit they were unable to call witnesses Timothy Maxwell, Wes Staley, Joshua Larsen, Robert Hornauer, Jared Maxwell, Vladimir Nypl, Robert Scott, and "[o]ther [v]ictims of the [b]oycott," who would have testified to the nature and effect of the boycott that constituted the wrongful interference with appellants' business relationships, which were at issue at trial. Appellants also contend they were unable to rebut testimony regarding nonparty Robert Scott's questionable integrity, the number of accredited practical examiners available in the state, Nypl's "practice" of placing test answers on the testing room walls,[10] and respondents' expert's testimony regarding damages.

The record does not support appellants' claim that the trial court abused its discretion in supervising the timing of the trial. Rather than calling their own party witnesses, appellants called Mitchell and Brent as adverse witnesses to present their case. When Mitchell and Brent gave reasoned testimony as to why the individual appellants had not been permitted to serve as NCCCO testers, rather than calling the individual appellants to present their claims, counsel kept adverse witnesses Mitchell and Brent on

---

[9] Appellants also examined their damages expert during that time.

[10] The actual testimony was he had done so once.

32.

the stand for five of appellants' allotted trial days.  Under the circumstances, the trial court did not abuse its discretion in holding appellants to the trial schedule.

A judgment will not be reversed due to the erroneous exclusion of evidence unless it appears, upon examining the entire cause, including the evidence, a miscarriage of justice has resulted.  (Cal. Const., art. VI, § 13; Evid. Code, § 354.)  A miscarriage of justice occurs only when the reviewing court is convinced it is reasonably probable a result more favorable to the appellant would have been reached absent the error.  (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 750-751.)  In light of the record evidence and the jury finding that neither IAI nor NCCCO intended to interfere with Nypl's and CCS's economic relationships, we are not convinced it is reasonably probable a result more favorable to appellants would have been reached had the excluded evidence been admitted.

## 2.     Admitting Evidence of Conduct Within the Settlement Agreement[*]

Appellants argue the trial court erred by permitting respondents to present evidence of the bribery incident—the testimony of Mona Perrine and Robert Curtis— because that claim had been settled and released.  We review a claim that the trial court erred in admitting evidence for abuse of discretion.  (*Dart Industries, Inc. v. Commercial Union Ins. Co*. (2002) 28 Cal.4th 1059, 1078.)

Appellants' briefing of this issue is deficient in two regards.  First, the extent of appellants' legal analysis on appeal is, "The basis for the trial objections and the in limine motion was that the matters sought to be introduced had already been released and settled.  See Trial Exh 3; See *Border Business Park, Inc., v. City of San Diego* (2006) 142 Cal.App.4th 1538 [(*Border Business Park*)]; *Villacres v. Abm Indus. Inc.* (2011) 189 Cal.App.4th 562."  Second, the cited cases address res judicata and collateral estoppel

---

[*]     See footnote, *ante*, page 1.

33.

but, at trial, appellants moved to exclude the evidence under Evidence Code section 352 as irrelevant and unduly prejudicial.

Ignoring the procedural deficiencies, to the extent appellants claim the evidence was barred by the doctrines of res judicata and collateral estoppel, they are wrong. The doctrines of res judicata and collateral estoppel prohibit the relitigation of claims and issues that have been adjudicated in an earlier proceeding. (*Border Business Park*, *supra*, 142 Cal.App.4th at p. 1563.) Neither doctrine applies here. NCCCO did not present the Mona Perrine and Robert Curtis testimony to relitigate the copyright or trademark infringement claims raised in the earlier federal lawsuit. Rather, the bribery incident testimony was relevant evidence presented in defense of appellants' interference with business relationships claim.

To establish wrongful interference, appellants had to show that respondents engaged in wrongful conduct that fell outside the privilege of fair competition or justification. (*PMC, Inc. v. Saban Entertainment, Inc*. (1996) 45 Cal.App.4th 579, 603, disapproved on other grounds in *Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1159, fn. 11 (*Korea Supply Co.*).) To defend against that claim, respondents had to show their conduct was justifiable. Whether conduct is justifiable depends on a balancing of the importance of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the defendant's conduct and the relationship between the parties. The factual issue presented is whether the defendant's conduct was fair and reasonable under the circumstances. (*Bert G. Gianelli Distributing Co. v. Beck & Co*. (1985) 172 Cal.App.3d 1020, 1054-1055.)

Accordingly, NCCCO's and IAI's knowledge of CCS's and Nypl's prior unlawful conduct was relevant to show that NCCCO and IAI acted reasonably to protect the integrity of the certification program rather than out of any intent to interfere with CCS's

and Nypl's business relationships. The trial court did not abuse its discretion in admitting the challenged evidence.

### 3. Instructional Error

Appellants contend the trial court erred in instructing the jury in six regards. The court erred by instructing (1) it had rejected in pretrial rulings some of appellants' claims and (2) other claims had been resolved against appellants by the federal court. It erred by refusing to instruct (3) regarding respondents' wrongful conduct and (4) on California's law of presumptions. In addition, (5) the trial court misstated the "weaker evidence" instruction to appellants' detriment and (6) erred in instructing on the doctrine of unclean hands, which did not apply.

Appellants' briefing of the first five asserted instructional errors is deficient; it contains virtually no legal argument or citation to authority. Accordingly, appellants have failed to meet their burden on appeal to show error and prejudice and we will find these contentions waived or meritless. We set forth the applicable standards for reference in reviewing appellants' claims.

On appeal, the reviewing court presumes the trial court's judgment is correct. As a result, appellants first bear the burden to overcome that presumption and demonstrate error. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) To meet this burden, appellate briefs must provide argument and legal authority for the positions asserted. When appellants assert the trial court erred but fail to support the assertion with reasoned argument and legal authority, the reviewing court will treat the issue as waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) This rule applies even when the appellate court is required to conduct de novo review. Although the trial court's ruling is reviewed independently, the scope of review is limited to those issues that have been adequately raised in appellants' brief. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

Appellants also bear the burden of affirmatively showing the error was prejudicial and resulted in a miscarriage of justice. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 [appellate court will not provide a legal argument as to how the trial court's error was prejudicial].) The giving of an erroneous instruction is not inherently prejudicial. A judgment will be reversed for instructional error only where it appears probable that the improper instruction actually misled the jury and affected the verdict. (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) Thus, to succeed on appeal, an appellant must establish error and show that the error was prejudicial.

### a. Instruction regarding resolution of claims

Appellants contend the court erred by "unnecessarily and inaccurately" instructing the jury as to which of appellants' theories of wrongful conduct were no longer part of the case: appellants' breach of contract and interference with contract claims; claims that the individual respondents interfered with business relations; the individual appellants' claims; violation of Cartwright Act claims; illegal trust claims; violations of unfair competition laws and false advertising claims. The extent of appellants' reasoned argument consists of a restatement of the directions for use note and the cases it cites that accompanies BAJI No. 7.82 and mere *argument*:

> "In an intentional interference case, a court must specifically state for the jury the conduct that the judge has determined as a matter of law would satisfy the 'wrongful conduct' standard. *PMC, Inc. v. Saban Entertainment, Inc.*[, *supra*,] 45 Cal.App.4th [at p. ]603; *Della Penna v. Toyota Motor Sales, U.S.A, Inc.* (1995) 11 Cal.4th 376, 393. The jury must then decide whether the defendant engaged in the conduct as defined by the judge. If the conduct is tortious, the judge should instruct on the elements of the tort. [¶] … [¶]

> "The 'clarifying' instruction was argumentative, and repetitive, gave the jury irrelevant and prejudicial information, and tainted deliberations. The trial court unduly emphasized its' [*sic*] rejection of [appellants'] claims, and instructed the jury not to find for [appellants] because the court

had already found against [appellants] on every ground, despite having let the intentional interference claim go forward. The jury had no reason to be apprised of these rulings as they were not part of the evidence, were argumentative and inflammatory, and should not have been part of the jury instructions."

Appellants cite no case law addressing instructional error. The limited discussion set forth above does not aid resolution of the legal issue appellants attempt to raise. Moreover, even if the court erred by giving the instruction, appellants ignore their burden to show how the error was prejudicial in light of other instructions given—including BAJI No. 7.82, which addresses intentional interference with prospective economic advantage—and the special verdict findings that resulted in the jury not reaching the wrongful conduct element of appellants' interference claim. In short, appellants have failed to demonstrate legal error or prejudice with respect to this asserted error.

### b. Instruction regarding the effect of the federal lawsuit

Appellants next contend the trial court erred by instructing the jury regarding the judicial findings in the second federal lawsuit that Nypl had violated the permanent injunction and breached the settlement agreement, and that Nypl's conduct had relieved NCCCO of the obligation to reinstate CCS and Nypl to the NCCCO Web site. Appellants assert the instruction was erroneous, irrelevant and prejudicial.

While appellants reargue the propriety of giving the instruction, they fail to cite case law and make no reasoned legal argument why the court erred in instructing as it did, nor do they address prejudice. As a result, appellants have failed to meet their burden on appeal to establish error and show prejudice. Therefore, this issue is waived. (*Cahill v. San Diego Gas & Electric Co.*, *supra*, 194 Cal.App.4th at p. 956; *Pool v. City of Oakland*, *supra*, 42 Cal.3d at p. 1069.)

### c. Instruction regarding respondents' wrongful conduct

Appellants contend the trial court was obligated to instruct regarding respondents' wrongful conduct and it erred by failing to instruct on the theories of monopoly and

violation of a state safety regulation. Appellants submit there was undisputed evidence that respondents were a monopoly, so the court erred in not providing a monopoly instruction. Further, because respondents admitted they violated California Code of Regulations, title 8, section 5006.1 by not testing prestart and poststart inspection in the practical exam as required by the regulation, the court erred by not instructing the jury to accept the regulation as fact to establish the "wrongful conduct" element of their claim.

Appellants' briefing of this issue fails to address prejudice. The trial court's failure to give a requested instruction is reversible error only if it seems probable that the jury was misled. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580–581.) Even assuming appellants were able to show error, they fail to discuss how the error was prejudicial when the jury never addressed the wrongful conduct element of their interference claim. The jury's negative response to the third question on the special verdict form of whether IAI and NCCCO intended to disrupt the relationship that CCS and Nypl had with practical examiners and test site coordinators ended their deliberations. The jury was never called upon to consider the fourth question, whether NCCCO and IAI had engaged in wrongful conduct. Accordingly, appellants have failed to meet their burden to show the asserted error was prejudicial. (*Pool v. City of Oakland*, *supra*, 42 Cal.3d at p. 1069.)

### d. Instruction regarding California's law of presumptions

In a related argument, appellants contend that Mitchell's admission that the practical exam did not comply with California Code of Regulations, title 8, section 5006.1 created a presumption that respondents acted with an unlawful intent under Evidence Code section 668. Therefore, the trial court erred in refusing to instruct that respondents were presumed to have an unlawful intent if the jury found they had violated the regulation. Similarly, the court erred in refusing to instruct pursuant to Evidence Code section 665 that a person is presumed to intend the ordinary consequences of his acts.

38.

These contentions fail on procedural grounds. Appellants do not support their claims of error with legal argument or citation of case law, nor do they address how the errors resulted in prejudice. Accordingly, the contentions are waived. (*Cahill v. San Diego Gas & Electric Co.*, *supra*, 194 Cal.App.4th at p. 956; *Pool v. City of Oakland*, *supra*, 42 Cal.3d at p. 1069.)

### e.      Instruction regarding weaker evidence

Appellants next contend the trial court misstated the "'weaker evidence'" instruction to their detriment. The trial court instructed, "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you *must* distrust the weaker evidence." The written instruction states you "may" distrust the weaker evidence. The court's misinstruction, coupled with appellants' inability to "finish their case" or put on rebuttal testimony, effectively told the jury to find against appellants.

Assuming the reporter's transcript correctly transcribed the oral instruction and the court misspoke while instructing the jury, appellants have not demonstrated the error was prejudicial. Misreading instructions is harmless error when the written instructions provided to the jury are correct. (*People v. Box* (2000) 23 Cal.4th 1153, 1212.) Here, the court provided the jury with the correctly worded written instruction. Nevertheless, appellants argue the error was prejudicial because the court did not permit them to complete their case. That argument is no more persuasive in this context than it was when raised earlier in the appeal. Moreover, appellants fail to cite case law or provide any reasoned legal argument as to why the error was prejudicial. Thus, this contention too is waived.

### f.      Instruction regarding the doctrine of unclean hands

Finally, appellants assert the court erred prejudicially by instructing on the doctrine of unclean hands because the instruction was "improper" under the

39.

circumstances and was applied in an unfair and inappropriate manner. Appellants support this contention with legal argument, but the arguments are not persuasive.

### i. As a matter of law

First, appellants contend the unclean hands doctrine is not a defense to an interference with economic relationships claim as a matter of law. They cite federal case law that holds the doctrine of in pari delicto does not apply to bar recovery in a federal antitrust action (*Perma Mufflers v. Int'l Parts Corp.* (1968) 392 U.S. 134, 138-139) and California case law that holds the doctrine of unclean hands is not a defense to an unfair trade or business practices claim based on a violation of the Unfair Competition Law (§ 17200 et seq.). (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179.)

The underlying rationales of the cases cited are similar: the antitrust laws are best served by insuring that a private action is a constant threat to deter anyone contemplating business behavior in violation of the antitrust laws (*Perma Mufflers v. Int'l Parts Corp.*, *supra*, 392 U.S. at p. 139) and permitting an unclean hands defense would judicially sanction a defendant who engaged in an act declared by statute to be void or against public policy (*Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 543). In general, the cases stand for the proposition that it is inappropriate to invoke the broad common-law barriers to relief in antitrust cases where a private suit serves important public purposes. (*Perma Mufflers v. Int'l Parts Corp.*, *supra*, at p. 138.)

Appellants reason that because the wrongful conduct element of the interference with prospective economic relations tort must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard" (*Korea Supply Co.*, *supra*, 29 Cal.4th at p. 1159, fn. omitted), the same rationale applies and the defense of unclean hands was inapplicable to their tort claim as a matter of law.

We find the analogy lacking. *Korea Supply Co.*, *supra*, 29 Cal.4th at page 1159, addresses the requirement that the interfering conduct must be wrongful by some legal measure other than the interference itself. That is, actionable interference cannot be merely a product of an improper, but lawful, motive. The interfering conduct must be "independently wrongful" under some statute, regulation, common law or legal standard. (*Ibid.*) Independently wrongful conduct, however, is not the same as conduct that violates the antitrust and unfair business practices statutes. Every tort claim involves conduct that is wrongful by some legal standard. But all tort claims, which involve disputes between individuals, are not entitled to immunity from the defense of unclean hands that antitrust and unfair business practice claims, which serve public as well as private purposes, are entitled to.

Respondents cite several cases that involve an intentional interference with economic relations claim and the defense of unclean hands. (*Fladeboe v. American Isuzu Motors Inc*. (2007) 150 Cal.App.4th 42, 52-53, 56 [the plaintiffs sought damages for, among other things, interference with economic relations; trial court's findings that the plaintiffs had unclean hands provided the defendant a complete defense]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 623 [defense of unclean hands was available against the legal claim for conversion]; *Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 132-133 [after the jury found for Wong on several causes of action, including interference with business relations, the court held Wong was barred from recovery under the unclean hands doctrine because the underlying transaction was illegal under Mexico's laws]; *Hoffman-La Roche, Inc. v. Promega Corp.* (N.D.Cal. 2004) 319 F. Supp. 2d 1011, 1028-1029 [the court dismissed breach of contract claims but denied request to dismiss interference claims under the doctrine of unclean hands].) While the cases do not directly address whether the doctrine of unclean hands applies to an interference with economic relations tort claim, they imply that it does.

41.

Accordingly, appellants have not established as a matter of law that the trial court erred by giving the unclean hands instruction in this case.

## ii. On the facts of this case

In their reply brief, appellants contend the court erred by instructing on unclean hands because that defense did not apply on the facts of this case. Assuming this issue is cognizable even though addressed in the reply brief (*People v. Zamudio* (2008) 43 Cal.4th 327, 353 [a contention may not be raised for the first time in a reply brief]), we find it meritless.

## a. Standard of review

The propriety of jury instructions presents a question of law that we review de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) The trial court is obligated to instruct the jury on every theory of the case advanced by either party that is supported by substantial evidence. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 572.) In this case, the trial court instructed the jury on the defense of unclean hands pursuant to respondents' request. The court instructed:

> "*Even if you were to determine that NCCCO and IAI interfered with economic relationships of CCS or John Nypl*, you may consider whether CCS and John Nypl are not entitled to receive a full recovery, or any recovery, of economic damages in view of their own misconduct. In evaluating the fairness of allowing CCS and John Nypl to recover damages in view of their own misconduct, you should consider: [¶] (1) The nature of their misconduct, including whether CCS and John Nypl instigated the misconduct that lead to their eventual injury, and the level of moral blame attributable to CCS and John Nypl relative to NCCCO and IAI; and [¶] (2) The relationship between CCS's or John Nypl's misconduct and their injury, including whether or to what extent their injury would have otherwise occurred." (Italics added.)

## b. Unclean hands doctrine

The doctrine of unclean hands arises from the maxim that one who comes into equity must come with clean hands. (*Blain v. Doctor's Co*. (1990) 222 Cal.App.3d 1048, 1059.) The doctrine requires that the plaintiff act fairly in the matter for which he seeks a

42.

remedy or he will be denied relief, regardless of the merits of the claim. The doctrine is available in legal and equitable actions. Whether the doctrine applies is a question of fact. (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

Precluding recovery to the plaintiff with unclean hands protects the court's rather than the defendant's interests. The unclean hands doctrine protects judicial integrity because allowing a plaintiff with unclean hands to recover creates doubt regarding the justice provided by the judicial system. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 978.)

Not every wrongful act falls within the unclean hands doctrine. But the misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.) The wrongful conduct must relate directly to the plaintiff's claims and affect the equitable relations between the litigants. There must be a direct relationship between the misconduct and the causes of action alleged such that it would be inequitable to grant the requested relief. (*Ibid.*)

Whether the plaintiff's misconduct is a bar to the claim for relief depends on: (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.)

### c.     Analysis

Appellants contend the doctrine does not apply in this case under the first factor, analogous case law. Analogous case law holds that the doctrine does not apply to claims under the federal and state antitrust statutes. Thus, by analogy, the doctrine does not apply to their interference with business relationships claim. This argument is the same as appellants' earlier argument that the doctrine of unclean hands does not apply as a matter of law. In rejecting that argument, we found the reasoning of cited cases, which address violations of the antitrust statutes, inapplicable to this case that involves a tort

43.

claim between private parties. In our view, the analogous case law consists of the cases cited by respondents that, at the least, imply that the unclean hands defense applies to claims for interference with economic relations.

Appellants next contend the doctrine does not apply under the second factor—the nature of the misconduct. They assert, "One can only guess what acts of misconduct herein could possibly exist since the court made no findings …." Appellants' skewed view of the trial record, which minimizes the evidence of their wrongdoing, renders their argument futile. Nypl's bribery, his attempts to evade the administrative sanctions, and the various fraudulent acts of those associated with him constitute ample evidence of misconduct of a nature to support instructing the jury on the doctrine of unclean hands.

Appellants cite *Jacobs v. Universal Development Corp*. (1997) 53 Cal.App.4th 692, 700 (*Jacobs*) for the proposition that appellants' conduct was not the type of conduct associated with unclean hands. In *Jacobs*, the sales director for residential developments brought a wrongful discharge action alleging he was fired after he told his employer he would no longer participate in an illegal rebate program. The trial court granted summary judgment for the defendant on the ground that the plaintiff, having participated in the illegal transactions, was in pari delicto with the defendant. (*Id.* at pp. 695-697.) The appellate court reversed. The court held that the doctrine of in pari delicto was not a proper basis for summary judgment in the defendant's favor. The defendant's evidence showed that the plaintiff, while consistently protesting to his immediate supervisors, acquiesced in the defendant's illegal rebate program because he feared being fired if he did not. Under the circumstances, application of the in pari delicto doctrine would unjustly enrich the defendant and violate fundamental public policy by allowing it to condition continued employment on criminal conduct. (*Id.* at pp. 701-702.)

*Jacobs* is distinguishable because, in this case, the jury rejected appellants' claim that respondents engaged in tortuous conduct. Rather, the facts of this case are more analogous to those in *Elliott v. Contractors' State License Bd*. (1990) 224 Cal.App.3d

1048. There, a contractor sued to overturn the State License Board's revocation of his contractor's license. The court denied his petition. The unclean hands doctrine precluded his recovery, where the evidence showed he had obtained his license with fraudulent representations concerning prior unpaid debts and disciplinary action. (*Id.* at pp. 1052, 1055; accord, *Wallace v. Board of Education* (1944) 63 Cal.App.2d 611, 617 [doctrine of unclean hands barred reinstatement of petitioner to his job following his mandatory retirement due to age where petitioner lied on his employment application, and was four years younger than he represented].) The nature of appellants' misconduct in this case amply supported the giving of an unclean hands instruction.

Finally, appellants contend the doctrine does not apply under the third factor, the relationship between appellants' misconduct and the claimed injuries. They are mistaken. The misconduct that brings the unclean hands doctrine into play must relate directly to the transactions at issue. It must infect the cause of action involved and affect the equitable relations between the litigants. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 984.) Cases illustrating unclean hands conduct directly related to the transaction at issue include *Unilogic, Inc. v. Burroughs Corp.*, *supra*, 10 Cal.App.4th at pp. 618, 621 [although the defendant converted the plaintiff's proprietary information during a failed joint project, the plaintiff's unclean hands—bribery to obtain the contract, failure to disclose financial difficulties, and its own conversion of the defendant's property during the same joint project—precluded relief]; and *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 639 [the plaintiffs' suit for wrongful termination was barred by evidence they had lied on their job applications]. Cases illustrating misconduct not sufficiently related to the transaction to warrant application of the unclean hands doctrine include *Pom Wonderful LLC v. Welch Foods, Inc.* (C.D.Cal. 2010) 737 F.Supp.2d 1105, 1111 [that Pom may have misled consumers to believe that its juices were not from concentrate did not constitute unclean hands in Pom's action against Welch for misleading consumers as to the amount of pomegranate juice in Welch's

45.

product; the relationship between the allegations was too tenuous]; *Murillo v. Rite Stuff Foods, Inc*. (1998) 65 Cal.App.4th 833, 845, 851-852 [the plaintiff's use of falsified immigration documents to obtain employment was not related to and did not preclude her sexual harassment claim]; and *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 729 [employer's breach of union contract was not directly related to transaction at issue—employer's suit for damages due to union members' tortious conduct on the picket line].

Appellants' argument on this point is unclear. The gist of appellants' contention seems to be there is no evidence they acted with unclean hands in relation to their interference claim. Again, appellants' failure to acknowledge the evidence in the record of their misconduct renders their argument unpersuasive. The record shows that appellants' repeated misconduct, starting with Nypl's bribery in 2005, lead to respondents' additional scrutiny of CCS and Nypl and the individuals they proffered to IAI and NCCCO as test site hosts and coordinators and accredited practical examiners, which in turn lead to appellants' interference claims. Because the record contains ample evidence showing the relationship between appellants' misconduct and their claimed injuries, the trial court did not err in giving an unclean hands instruction.

To the extent appellants complain the instruction was improper because the court did not give them an opportunity to rebut the evidence of their unclean hands, we reject this argument for the same reasons set forth earlier.

Finally, appellants address prejudice as follows:

"For Respondent[s] to argue that each complained of instruction is not prejudicial error because it referred to a question later in the jury verdict form simply begs the question of the entire issues of this appeal. These instructions taken together with the other instructions discussed in [Appellants'] papers, conveyed a bias, were unduly focused, and were fatally prejudicial to [Appellants]. That the jury acted as instructed in these prejudicial and argumentative instructions is inescapable. The unclean hands instruction in combination with the other discussed instructions

46.

demonstrates beyond any doubt that [Appellants] in this case were deprived of a fair and impartial trial."

We disagree. The jury finding that resulted in the verdict for respondents was that neither NCCCO nor IAI intended to disrupt the relationships that CCS and Nypl had with test site coordinators and practical examiners. That finding rendered it unnecessary for the jury to consider whether appellants' conduct constituted unclean hands. As such, appellants have failed to show how the unclean hands instruction, even if given in error, impacted the jury's verdict or deprived them of a fair trial.

## B. Demurrer

Appellants contend the trial court erred in sustaining respondents' demurrer to the antitrust causes of action because the complaint alleged an illegal third-party vertical boycott. Respondents contend the complaint was deficient in five regards. We will reverse.

### Standard of Review

On review of the order sustaining respondents' demurrer, we examine the complaint de novo to determine whether it alleged facts sufficient to state a cause of action under any legal theory. (*McCall v. PacifiCare of Cal., Inc*. (2001) 25 Cal.4th 412, 415.) We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (*Aubry v. Tri-City Hospital Dist*. (1992) 2 Cal.4th 962, 966-967.) We construe the allegations liberally with a view toward substantial justice between the parties. (*Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 18; *Bondi* v. *Jewels by Edwar, Ltd*. (1968) 267 Cal.App.2d 672, 676.) We give the complaint a reasonable interpretation, and disregard possible problems of proof. (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1034.)

### 1. Third Amended Complaint

The Cartwright Antitrust Act causes of action allege in pertinent part: before 2005, CCS was the largest crane operator training school and had the highest pass rate of

any school in the United States. Competing schools charged much higher tuition fees and had lower pass rates.

NCCCO is principally made up of other training schools, each of whom is in direct competition with CCS. Many members of NCCCO's board of directors and many of its commissioners are direct competitors of CCS and Nypl. NCCCO required all crane operator training schools to agree not to do business with any other certifying organization.

IAI prepares and administers NCCCO's tests to crane operator candidates. IAI charges candidates for every test and divides the fees with NCCCO. Candidates who do not pass the test must pay to retest.

In 2005, Bud Wilson, a member of an ongoing price-fixing conspiracy by commissioners of NCCCO and other competing crane schools, asked Nypl and CCS to join their price fixing agreement and increase tuition substantially. The offer was made with the knowledge and consent of NCCCO, its commissioners and management, and IAI. Nypl refused to join in the illegal price fixing or to sign NCCCO's noncompetition agreement. As a result, NCCCO, its commissioners and IAI agreed to boycott appellants. Pursuant to the agreement, students from CCS or any school associated with CCS or Nypl would not be permitted to take NCCCO's examinations or to be certified by NCCCO; respondents' agents would harass Nypl, CCS, and any crane school associated with Nypl and CCS; and respondents would seek to eliminate all persons and entities associated with CCS and Nypl from respondents' testing and certification services. The intent of the agreement and boycott was to force appellants out of business.

NCCCO exerts monopoly power over the crane school marketplace in California because it is the only entity providing an essential service required to compete in the crane operator school marketplace. Training schools like appellants must have regular access to test site coordinators and practical examiners approved and accredited by NCCCO in order to compete in the marketplace. Respondents were thus able to fix

48.

prices and eliminate competition in the marketplace. IAI pays a significant portion of the testing fees it receives to NCCCO in the form of secret kickbacks.

Pursuant to the conspiracy, IAI refused to allow appellants' candidates to take the written and practical exams, and refused to allow individuals associated with CCS to schedule written or practical exams for the candidates appellants trained. As a result, students who wished to be certified could not use appellants' crane training services.

Pursuant to the conspiracy, NCCCO and IAI boycotted appellants by refusing to allow CCS and the individual appellants to act as test site coordinators, or to provide accredited test site facilities or to administer NCCCO's written and practical tests. In addition, respondents threatened and intimidated persons appellants sought to employ to act as practical examiners, test site coordinators, and test equipment and service providers. Respondents also placed unreasonable procedural burdens on appellants that were not imposed on other crane schools, intimidated appellants' students, refused to grade their exams or delayed the release of exam scores for months, made derogatory statements about Nypl and CCS to potential clients, and made test facilities and examiners "'unavailable'" to appellants' students for "bogus" reasons. Finally, the NCCCO board of directors denied Nypl's application to have CCS registered as a NCCCO written exam test site, to have Nypl serve as a test site coordinator, and to have CCS listed on the NCCCO Web site as a training provider.

As a result of the boycott, appellants lost profits, business value and goodwill, and incurred unnecessary expenses. Respondents' acts also damaged the crane school marketplace in California. The boycott reduced competition and severely constrained the largest and least expensive crane school in the state, resulting in higher and less competitive crane school prices for students and more retesting fees for NCCCO, IAI and the competing crane schools. Finally, there had been substantial lessening of competition, crane operations prices had increased, safety had been compromised and innovation had been hampered.

### a.    Individual appellants

Regarding the individual appellants, the third amended complaint alleged that respondents engaged in a concerted effort to boycott individuals who sought to work with CCS. Larsen, who did business as AAA Crane School, had been authorized by NCCCO as a test site coordinator and practical examiner. He worked with Nypl and CCS to provide crane training and NCCCO certification testing. After CCS was removed from the NCCCO Web site as a result of the federal lawsuit, NCCCO removed AAA Crane School from NCCCO's Web site because AAA Crane School's Web site referred extensively to CCS. After that, NCCCO accused Larsen and AAA Crane School of test irregularities, NCCCO entered Larsen's practical exam sites without permission, ordered Larsen to remove the CCS logos from the cranes he was using to test clients, intimidated his clients, and eventually revoked his status as a practical examiner, proctor, and test site coordinator. Respondents' acts evidenced their agreement to harass, intimidate and boycott any person or company that was associated with CCS. The revocation and refusal to reinstate Larsen effectively excluded him from the crane school business.

Timothy Maxwell completed the exams required for accreditation as a practical examiner for NCCCO. Nevertheless, his application for accreditation was denied on the pretext that he had misrepresented certain matters concerning test administrations. The real reason for the denial was his business relationship with CCS.

Vladamir attended a practical examiner workshop and passed the written exams and the practical exam at AAA Crane School to become a certified crane operator and an accredited practical examiner. Pursuant to the conspiracy, NCCCO refused to certify him until he retested with another accredited practical examiner. NCCCO's allegations regarding Vladamir were a pretext to boycott his participation as a practical examiner.

Jared Maxwell was a test site coordinator and an accredited practical examiner. In 2007, NCCCO denied his request to host test sites and notified him that his site could no

longer be used for testing.  The reasons given were a pretext to boycott him pursuant to the conspiracy.

As a result of respondents' boycott for anticompetitive reasons, appellants were unable to acquire customers for their crane school and testing services, and were precluded from earning a living in their chosen field, which lead to a loss of income.

### b. Cartwright Antitrust Act violation allegations

By doing the acts alleged above, respondents combined to form an illegal trust and conspired among themselves to restrain trade and eliminate competition in the California crane testing and training marketplace.  Respondents' boycott of appellants prevented them from participating in the crane operator training market in violation of the Cartwright Act.

### c. Illegal trust allegations

Respondents used the monopoly market power created by their illegal trust to boycott appellants, their customers and associates from the crane training and testing marketplace.  They did so for the purpose of fixing and maintaining the high, noncompetitive prices they charged for certification.  Respondents operated an "essential facility" for the operation of crane operator schools and denied appellants access in order to eliminate them from the commercial crane training school marketplace.

### 2. Demurrer to Third Amended Complaint

Respondents demurred to appellants' claims for violations of the Cartwright Act and for illegal trust on the ground appellants failed to state facts sufficient to state a cause of action in five regards:  (1) appellants failed to allege the requisite "'antitrust injury'" to establish standing; (2) appellants' alleged injury was indirect and speculative because they did not allege a right to serve as NCCCO's testing agents; (3) appellants failed to allege material facts regarding the formation, membership, operation and illegal acts of the conspiracy; (4) appellants failed to allege the requisite injury to competition; and (5) appellants failed to define a relevant market in terms of product or service and the

51.

complaint allegations show that respondents did not have significant market power or a significant market share of the relevant market.

The trial court sustained the demurrer to the Cartwright Antitrust Act violation and illegal trust causes of action in the third amended complaint without leave to amend on the ground that both failed to allege facts sufficient to constitute a cause of action against respondents. On appeal, appellants do not distinguish between the two causes of action and both appear to allege the same wrongful conduct and damages. We consider them as one.

### a. Elements of a Cartwright Act violation

Section 16720 of the Cartwright Act defines an unlawful trust as "a combination of capital, skill or acts by two or more persons" for enumerated purposes that restrains trade. Section 16726 provides that "every trust is unlawful, against public policy and void." Section 16750, subdivision (a), confers a private right of action on "[a]ny person who is injured in his … business or property by reason of anything forbidden or declared unlawful by this chapter …." The Cartwright Act is patterned after the federal Sherman Antitrust Act (15 U.S.C. § 1 et seq.), so decisions under the Sherman Act are applicable under the Cartwright Act. (*Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 717 (*Kolling*).)

To state a cause of action under the Cartwright Act, appellants must allege (1) the formation and operation of a conspiracy, (2) illegal acts done pursuant thereto, and (3) damage proximately caused by the acts. (*Kolling*, *supra*, 137 Cal. App.3d at p. 717.) California requires a high degree of particularity in the pleading of Cartwright Act violations. To be sufficient, the complaint must allege specific conduct in furtherance of the conspiracy to reduce competition. (*Marsh v. Anesthesia Services Medical Group, Inc*. (2011) 200 Cal.App.4th 480, 493 (*Marsh*).)

The Cartwright Act prohibits combinations in unreasonable restraint of trade. Certain restraints, including some group boycotts, are conclusively presumed to be

unreasonable and illegal. (*Marsh*, *supra*, 200 Cal.App.4th at p. 493.) A vertical boycott consists of collaboration among business entities occupying different levels of distribution to deny a competitor at one level the benefits enjoyed by the members of the vertical combination. (*Id.* at p. 494.)

Appellants assert they have alleged a third-party vertical boycott. That is, NCCCO, IAI and the unnamed coconspirator crane schools conspired to boycott appellants from access to the essential testing services that are provided to other competing schools in the state. Appellants submit their allegations mirror those found to be sufficient in case law and the trial court erred in sustaining the demurrers.

### b. Case law

In *Radiant Burners v. Peoples Gas Co*. (1961) 364 U.S. 656 (*Radiant Burners*), a manufacturer of gas heaters sued a trade association and 10 of its members, including pipeline companies, gas distributors and manufacturers of gas burners, alleging that the defendants had conspired to restrain commerce in the manufacture and sale of gas burners. The complaint alleged that American Gas Association (AGA) operated testing laboratories in which it purported to determine the safety, utility and durability of gas burners. It affixed a "seal of approval" on gas burners that passed its tests. (*Id*. at p. 658.) Its tests were not based on objective standards, but were influenced by the respondents, some of whom were in competition with petitioner, and thus its determinations were made arbitrarily and capriciously. The plaintiff had twice submitted its radiant burner to AGA for approval, but it had not been approved, although it was safer, more efficient than, and as durable as gas burners that AGA had approved. AGA and its utility members carried out the unlawful conspiracy by refusing to provide gas for use in the plaintiff's radiant burners, which were not approved by AGA. As a result, the plaintiff's gas burners had been effectively excluded from the market because potential customers would not buy gas burners for which they could not obtain gas. As a result, the plaintiff lost substantial profits. (*Ibid.*)

The United States Supreme Court found the complaint stated an antitrust claim. The respondents' conspiratorial refusal to provide gas for use in the plaintiff's gas burners because they were not approved by AGA showed a type of trade restraint and public harm that the Sherman Act forbad. Further, the alleged conspiratorial refusal to provide gas for use in the plaintiff's burners had, by its nature and character, a monopolistic tendency that was not to be tolerated merely because the plaintiff was just one manufacturer whose business was so small that his destruction made little difference to the economy. (*Radiant Burners, supra*, 364 U.S. at pp. 659-660.)

Similarly, in *Fashion Guild v. Trade Comm'n.* (1941) 312 U.S. 457 (*Fashion Guild*), manufacturers of women's clothing claimed that their designs, though not protected by patent or copyright, were original and distinctive. To suppress competition by those who copied their designs and sold them at lower prices, the manufacturers refused to sell to retailers who sold the copies or would not agree not to sell them. The Federal Trade Commission (FTC) concluded that the practice constituted unfair methods of competition tending to monopoly and issued a cease and desist order. (*Id.* at pp. 461-464.)

The manufacturers argued their boycott was reasonable and necessary to protect against the evils of pirating of original designs. The FTC properly excluded the manufacturers' evidence on this subject. The reasonableness of the methods pursued by the combination to accomplish its unlawful object was no more material than the reasonableness of prices fixed by unlawful combination. (*Fashion Guild, supra,* 312 U.S. at pp. 467-468.)

In *American Soc. of M. E., Inc. v. Hydrolevel Corp.* (1982) 456 U.S. 556 (*American Society*), ASME was a nonprofit membership corporation that promulgated codes for engineering and industry. The codes, while only advisory, had an economic impact, and many were incorporated in federal regulations and state and local laws. One code set forth standards for components of heating boilers, including low-water fuel

54.

cutoffs, a safety device. (*Id.* at pp. 558-560*.*) Hydrolevel, a manufacturer of low-water fuel cutoffs, made devices that differed slightly from those manufactured by its major competitor, M&M. One of M&M's officers was on the ASME committee that was responsible for interpreting standards for low-water fuel cutoffs. He influenced the committee to interpret the standards in a way that Hydrolevel's product did not comply. (*Id.* at pp. 560-561.) M&M then advised purchasers not to purchase Hydrolevel's product because it did not comply with ASME's standards, which hurt Hydrolevel's business. Hydrolevel sued ASME for violations of the Sherman Act. (*American Society*, *supra*, at pp. 562-564.)

The Supreme Court held that AMSE was liable under the antitrust laws for the acts of its agents. (*American Society*, *supra*, 456 U.S. at p. 568.) The court noted the power of ASME's agents to restrain competition. A standard-setting organization like ASME was rife with opportunities for anticompetitive activity. Many of ASME's officers were associated with businesses regulated by ASME's codes. While most would serve honorably, others might view their position with ASME as an opportunity to benefit their employer. In light of the great influence of ASME's reputation, ASME's agents had the opportunity to harm their employers' competitors through manipulation of ASME's codes. (*Id.* at p. 571.) Therefore, a rule that imposed liability on the standard-setting organization, which was in the best position to prevent antitrust violations through the abuse of its reputation, fostered the congressional intent that the private right of action be available to deter antitrust violations. (*Id.* at pp. 572-573.)

### c. Analysis

Under *Radiant Burners, Fashion Guild*, and *American Society,* appellants' allegations of the three requisite elements—the formation and operation of a conspiracy, illegal acts done pursuant thereto, and damage proximately caused by such acts—were sufficient. Appellants alleged:

(1) NCCCO, IAI, the individual respondents, and the unnamed coconspirator crane school operators, who control NCCCO as members of its board of directors and commissioners, conspired to fix the price of tuition for crane operator training schools and invited Nypl and CCS to join the conspiracy; when Nypl and CCS refused to join the price-fixing scheme, NCCCO, its commissioners, and IAI conspired to boycott CCS and individuals associated with CCS from access to NCCCO's testing services, which are essential for crane operator certification.

(2) Pursuant to the conspiracy to boycott and for anticompetitive reasons, respondents refused to accredit the otherwise qualified individual appellants as NCCCO testers and "a competing training school refused to allow [appellants' students] to test at its 'open test site' stating that NCCCO told them not to test … Nypl's … students." Respondents also threatened and intimidated persons Nypl and CCS sought to employ to act as testers for CCS's students.

(3) The boycott damaged appellants' business and property, as well as competition within the crane operator training school marketplace.

While the allegations could be clearer, the three elements are sufficiently set forth to survive a demurrer.

### d. Respondents' contentions

Respondents contend the trial court properly sustained the demurrer to the Cartwright Act violations and illegal trust causes of action. On appeal, they submit the complaint was deficient in five regards. Each is considered in turn.

### i. Antitrust injury

Respondents first contend the allegations that NCCCO and its agents boycotted appellants from access to crane testing services, alleged only damage to a competitor, which is a business tort rather than antitrust injury. Thus, appellants lacked standing to assert the antitrust causes of action. In addition, because the alleged boycott followed Nypl's refusal to join an alleged illegal price-fixing scheme, the competition reducing

56.

effect of the boycott was *higher* prices to crane school students, which would *benefit* competitors in the crane school market. Accordingly, the alleged monopoly pricing could not have harmed NCCCO's competitors, such as appellants, so as to give appellants standing to sue.

Neither contention has merit. Section 16750, subdivision (a), provides that a Cartwright Act violation action may be brought by "[a]ny person who is injured in his or her business or property by reason of anything forbidden [by the Act]." Appellants alleged injury to their business and property by reason of respondents' conspiracy to engage in a group boycott against them for anticompetitive reasons. Appellants' alleged injury is similar to that in *Radiant Burners* and *American Society*. Appellants could not compete for students in the crane operator training school market if, because of the alleged conspiracy and boycott, their students had no access to the NCCCO testing services required for certification. The conspiratorial refusal to allow appellants' students access to NCCCO testing because Nypl and CCS refused to participate in the crane school price-fixing agreement alleged a type of trade restraint and public harm that the Cartwright Act forbids. Further, the alleged conspiratorial refusal to provide the required testing access to CCS students, who pay the lowest tuition and have the highest pass rate in the nation, was, by its nature and character, anticompetitive and an unreasonable restraint of trade. (*Radiant Burners, supra*, 364 U.S. at pp. 659-660.)

Two additional cases support this conclusion. In *Kolling*, *supra*, 137 Cal.App.3d 709, the court considered whether Kolling's pleading and proof that Dow Jones terminated his newspaper distributorship for an anticompetitive reason—his noncompliance with an illegal price-fixing policy—were sufficient to support a verdict for damages. Dow Jones had asked Kolling to convince uncooperative retailers to whom he distributed the Wall Street Journal to sell the newspapers at the price suggested by Dow Jones. Kolling was only partially successful. (*Id.* at p. 713.) Kolling also had disputes with Dow Jones over his distributorship territory that resulted in his territory

being reduced against his wishes. When Kolling refused to adhere to his new territory restrictions, Dow Jones reduced the number of papers it sold to him for distribution and eventually terminated him. Kolling attempted to sell his distributorship to a third party, but Dow Jones took the position the distribution rights were not saleable. (*Id.* at pp. 715-717.) Kolling sued and a jury found for him on his Cartwright Act claim. (*Id.* at p. 712.)

On appeal, the court rejected Dow Jones's contention that Kolling did not suffer legally cognizable damages. It explained, the plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries. This "'standing to sue'" requirement was intended to insure that antitrust injury claims are brought only by those within the "'target area'" of the antitrust violation, and not by one incidentally injured thereby. (*Kolling*, *supra*, 137 Cal.App.3d at p. 723.) An "'antitrust injury'" was the type of injury the antitrust laws were intended to prevent; that is, an injury that flowed from the defendants' unlawful acts. (*Ibid*.) Kolling suffered the type of injury the antitrust laws sought to prevent. Dow Jones's termination of Kolling's distributorship and its refusal to recognize his replacement distributor resulted directly from the price-fixing scheme and Dow Jones's attempts to further it. Kolling's injuries were not secondary or remote, but the direct result of the unlawful conduct. Consequently, he had shown an injury caused by conduct that the antitrust laws sought to prevent. (*Id*. at p. 724.)

Similarly, in *Klor's v. Broadway-Hale Stores* (1959) 359 U.S. 207 (*Klor's*), Klor's, which operated a retail store in San Francisco selling household appliances, brought an action under the federal antitrust laws against Broadway-Hale, a chain of department stores with a store next door to Klor's, as well as manufacturers and distributors of well known appliance brands. Klor's alleged that the manufacturers and distributors conspired among themselves and with Broadway-Hale either not to sell to Klor's or to sell only at discriminatory prices and highly unfavorable terms. These acts had seriously damaged Klor's profits, goodwill, reputation and prestige. (*Id.* at

pp. 208-209.)  Broadway-Hale did not deny the allegations, but moved for summary judgment and dismissal of the complaint for failure to state a cause of action.  They averred that there were hundreds of other retailers selling the same and competing appliances in the same community and contended that the controversy was a private quarrel between Klor's and Broadway-Hale that did not amount to a "'public wrong proscribed by the [Sherman] Act.'"  (*Id.* at pp. 209-210.)

The Supreme Court disagreed and held that Klor's allegations showed a group boycott, which was forbidden by the Sherman Act.  This was not a case of a single trader refusing to deal with another, nor of a manufacturer and a dealer agreeing to an exclusive distributorship.  Rather, the complaint alleged a wide combination consisting of manufacturers, distributors and a retailer refusing to deal with Klor's.  The boycott deprived Klor's of its freedom to buy appliances in an open, competitive market and drove it out of business as a dealer of Broadway-Hale's products.  The boycott also deprived the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale.  The boycott had, by its nature and character, a "'monopolistic tendency.'"  (*Klor's*, *supra*, 359 U.S. at pp. 212-213.) Further, a group boycott would not be tolerated merely because the victim was only one merchant whose business was so small that his destruction made little difference to the economy.  (*Id*. at p. 213.)

Under *Kolling* and *Klor's*, appellants have alleged the type of injury the antitrust laws seek to prevent.  According to the allegations of the third amended complaint, CCS was the largest and least expensive crane operator training school in the state.  After Nypl refused to raise CCS's tuition and join the price-fixing scheme among the crane schools that control NCCCO, respondents conspired to boycott appellants' students from access to NCCCO's testing services, and refused to recognize the individual appellants as accredited examiners, which effectively deprived appellants' students of access to the testing they needed for certification, and thereby constrained Nypl's and CCS's business

59.

and deprived the individual appellants of the ability to work for CCS. Appellants' injuries, like the injuries in *Kolling*, were the direct result of the unlawful conduct. Appellants were all direct victims of the alleged boycott undertaken as a means to accomplish the alleged price-fixing conspiracy in the crane training school marketplace. The allegations of a boycott from access to testing services is analogous to the allegations of a boycott from access to products in *Klor's*. Consequently, the third amended complaint alleges the requisite antitrust injury and respondents' assertions to the contrary are meritless.

The cases respondents cite to support their argument that the antitrust injury allegations are deficient are not helpful. Respondents cite *Knevelbaard Dairies v. Kraft Foods, Inc.* (9th Cir. 2000) 232 F.3d 979, 988 (*Knevelbaard*) for the proposition that "mere damage to a supposed competitor, even as part of a conspiracy, is not sufficient to state an antitrust claim absent 'antitrust injury.'" On that point, the court in *Knevelbaard* considered Kraft's argument that a conspiracy to depress milk prices would not harm consumers but benefit them, because reduced milk acquisition costs would mean lower cheese manufacturing costs and, therefore, lower prices for cheese products. Therefore, Knevelbaard's alleged injury from selling at lower, more competitive prices, was not enough. (*Id. at* p. 988.) The court, however, rejected the argument and stated, "When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured in fact. The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices." (*Ibid.*) Because the *Knevelbaard* court rejected an argument akin to respondents, it does not support their challenge.

Respondents also cite *Atlantic Richfield Co. v. USA Petroleum Co*. (1990) 495 U.S. 328 for the proposition that to the extent the alleged price-fixing caused higher crane school prices, there was no antitrust injury. Respondents' argument misses the mark.

The third amended complaint alleged that respondents agreed to boycott appellants for anticompetitive reasons, which resulted in suppression of competition among crane schools and distortion of prices—not simply higher prices to students—as respondents suggest. Further, respondents' argument that the result of the alleged price-fixing scheme was more revenue to competitors in the marketplace, is irrelevant. Appellants did not allege they were injured by the *price-fixing* agreement. They alleged they were injured by the *boycott*, which followed Nypl's and CCS's refusal to join the price-fixing agreement. Those allegations sufficiently state an antitrust injury.

### ii.    Injury indirect or speculative

Respondents contend appellants' injury is indirect and speculative because they did not allege any "'right'" to serve as NCCCO's testing agents. Further, appellants' failure to allege that NCCCO was required to let them serve as its agents for crane certification testing or that NCCCO's failure to do so injured competition was fatal to their antitrust claim. The only case law cited to support this challenge is *Wholesale Electricity Antitrust Cases I and II* (2007) 147 Cal.App.4th 1293, which does not support respondents' position. There, the plaintiffs brought antitrust actions against generators, traders and wholesalers of electricity from activities arising out of the market conditions during the energy crisis of 2000. The trial court properly sustained demurrers on federal preemption grounds. (*Id.* at pp. 1309-1316.)

Respondents' argument that appellants must allege a right to serve as testers to state a viable claim is analogous to Dow Jones's argument that Kolling could not recover under the Cartwright Act because his distributorship was terminable at will. (*Kolling*, *supra*, 137 Cal.App.3d at p. 718.) The *Kolling* court rejected Dow Jones's claim, reasoning that while a producer may normally choose its distributors, cancellation of a distributorship for anticompetitive reasons violates the antitrust laws. The critical inquiry was whether the refusal to deal, manifested by a combination or conspiracy, was so anticompetitive in purpose and effect as to be an unreasonable restraint of trade. Thus,

the terminable nature of Kolling's distributorship did not defeat his antitrust action. Rather the court looked to the evidence of a conspiracy and an anticompetitive purpose and effect behind the termination. (*Id.* at p. 719.)

By analogy, appellants were not required to allege a right to be accredited as NCCCO testers. Rather, allegations that respondents conspired to bar appellants from access to testing services for anticompetitive reasons, which resulted in reduced competition in the crane operator training school marketplace, were sufficient.

### iii. Formation, membership and operation of the conspiracy

Respondents submit that appellants failed to allege material facts regarding the formation, membership, operation and illegal acts of the conspiracy. Further, to the extent, there are allegations regarding formation and membership of the conspiracy, they consist of mere conclusions and speculation. We disagree.

Regarding the formation of the conspiracy, the agreement need not be formal and the combination may be tacit. (*Kolling, supra*, 137 Cal.App.3d at pp. 720-721.) But appellants cannot allege a conspiracy generally in the words of the statute. They must allege the concerted action with particularity, including the formation and operation of specific combinations with specific parties. (*Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 317-318; accord, *Texaco Inc. v. Dagher* (2006) 547 U.S. 1, 5 [the plaintiffs must demonstrate that a particular contract or combination is unreasonable and anticompetitive before it will be found unlawful].)

While the allegations of the third amended complaint could be more explicit, appellants have sufficiently alleged the formation of a conspiracy to restrict trade in the crane operator training school marketplace. (§ 16720, subd. (a).) Appellants alleged that Bud Wilson, a member of the price-fixing conspiracy involving the NCCCO commissioners and other competitors in the crane school marketplace, asked appellants to join the price-fixing conspiracy. When Nypl and CCS refused, the coconspirator crane operator training schools and respondents agreed to boycott appellants from NCCCO's

62.

testing and certification services, and to harass, annoy and disrupt schools operated by or associated with appellants with the intent to force appellants out of business. None of the case law respondents cite requires more.

Likewise, appellants have sufficiently alleged membership in the conspiracy. Respondents contend appellants did not identify the crane operator training schools by name that allegedly conspired with respondents to boycott appellants, they did not identify any crane schools that "made up" or served as the commissioners of NCCCO, and they did not allege any facts that tied Bud Wilson, who made the price-fixing offer to Nypl, to any particular crane training school or any named respondent. Respondents conclude that appellants' allegations were mere conclusions and speculation; thus, appellants' failure to identify any crane school coconspirator by name rendered the conspiracy allegations fatally uncertain.

According to the allegations of the third amended complaint, the members of the conspiracy are NCCCO, NCCCO's commissioners (who are named in ¶ 42 of the third amended complaint ), IAI, the individual respondents and the unnamed coconspirator crane operator training schools who "make up and control NCCCO." While a conspiracy must be stated in more than conclusionary terms (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 267), appellants' allegations suffice. Respondents cite no authority— and we have found none—requiring that all alleged coconspirators be identified by name.

In a related argument, respondents assert that absent any named coconspirator crane operator training schools, respondents were the only identified conspirators. Because the complaint alleged each respondent was the agent of his corespondents and acted within the course and scope of that agency in doing the acts alleged, appellants have failed to allege the requisite concerted action by separate entities.

To establish a Cartwright Act violation, appellants must allege a combination or acts by two or more persons or entities. (§ 16720.) A complaint for antitrust violations that fails to allege such concerted action by separate entities maintaining separate and

63.

independent interests is subject to demurrer. (*G.H.I.I. v. MTS, Inc., supra*, 147 Cal.App.3d at p. 266.) A corporation cannot conspire with itself or its agents under the antitrust laws. (*Kolling*, *supra*, 137 Cal.App.3d at p. 720.)

The United States Supreme Court addressed the separate entity element in *American Needle, Inc. v. NFL* (2010) 560 U.S. 183 (*American Needle*). There, the National Football League (NFL), an association of the 32 professional football teams, formed National Football League Properties (NFLP) to license the teams' intellectual property. (*Id.* at pp. 186-187.) Initially, NFLP granted nonexclusive licenses to American Needle and others to produce and sell trademarked apparel. Later, the teams authorized NFLP to grant exclusive licenses and NFLP granted Reebok an exclusive license to manufacture and sell trademarked headwear for the 32 teams. American Needle, whose license was not renewed as a result, sued, alleging that the agreement between the NFL, its teams, NFLP, and Reebok violated the Sherman Act. The defendants answered and alleged that the teams, the NFL, and NFLP were incapable of conspiring within the meaning of the statute "'because they are a single economic enterprise, at least with respect to the conduct challenged.'" (*American Needle*, *supra*, at pp. 187-188.)

The Supreme Court disagreed. It held that the licensing activities constituted concerted action within the meaning of the Sherman Act. The relevant inquiry was whether the agreement joined together separate economic actors pursuing separate economic interests. If an agreement joined together entities that were independent centers of decisionmaking, the entities were capable of conspiring under the Sherman Act. (*American Needle, supra*, 560 U.S. at pp. 195-196.) Each NFL team was independently owned and managed, and their objectives differed. While the teams had common interests such as promoting the NFL brand, they were separate, profit-maximizing entities, and their interests in licensing team trademarks were not necessarily aligned. (*Id.* at pp. 196-197.) Therefore, NFLP's decisions about licensing the teams'

separately owned intellectual property were concerted activity and thus covered by the Sherman Act.  (*American Needle*, *supra*, at p. 201.)

In this case, the agency allegations of the complaint may raise an inference that respondents acted as a single entity.  However, other allegations regarding the separate legal status of IAI (a for-profit corporation) and NCCCO (a nonprofit corporation) and their separate roles and actions in relation to appellants' claims, raise a conflicting inference that they are separate economic actors pursuing separate economic interests.  Accordingly, under *American Needle*, the allegations were sufficient to meet the requirement of separate entities under the Cartwright Act.

In addition, respondents' contention ignores the unnamed coconspirator crane schools, which are not alleged to be the agents of the named respondents, and are therefore separate entities for purposes of the Cartwright Act violation.

Respondents next assert the allegations regarding the operation of the conspiracy are deficient.  Respondents read the allegations narrowly and conclude that all but one of the alleged conspiracy terms are actions performed solely by NCCCO or its agents.  Thus, the complaint failed to set forth the operation of a conspiracy.  The terms of the conspiracy were set forth in paragraph 12 of the third amended complaint.  For many of the terms, NCCCO was the primary actor.  But, construed liberally, the third amended complaint alleged that respondents NCCCO, IAI and the coconspirator crane schools agreed among themselves to refuse to test students from appellants' school and from schools associated with appellants.  One allegation specifically alleged concerted action by an unnamed coconspirator:  "[i]n August 2006, a competing training school refused to allow a group of [appellant] J. Larsen's crane student customers to test at its 'open test site' stating that NCCCO told them not to test [appellant] John Nypl's … students."

Respondents also contend appellants have not alleged any illegal acts done pursuant to the conspiracy because NCCCO's refusal to allow appellants to perform crane operator testing on behalf of NCCCO was not illegal.  Respondents ignore the

allegations that their refusal was a concerted action for an anticompetitive purpose after appellants refused to join the ongoing price-fixing conspiracy among appellants' crane school competitors who make up and "control" NCCCO. Under *Kolling, supra*, 137 Cal.App.3d 709 and *Radiant Burners, supra,* 364 U.S. 656, the allegations were sufficient.

### iv.    Injury to competition

Respondents contend appellants failed to allege the requisite injury to competition in the crane operator training school market, citing *McGlinchy v. Shell Chemical Co*. (9th Cir. 1988) 845 F.2d 802 (*McGlinchy*). "Appellants did not allege how any particular contract or combination was 'unreasonable' *and* 'anti-competative,' because Appellants do not plead facts showing the requisite *injury to competition* as opposed to some purported injury to themselves." While respondents' precise challenge is not clear, *McGlinchy* reiterates the federal rule that a party must allege "'antitrust injury,'" which should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. (*Id.* at p. 811.) However, the more restrictive definition of "'antitrust injury'" under federal law does not apply to section 16750. (*Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1234.)

For example, in *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*. (2011) 198 Cal.App.4th 1366, 1381, the court reversed summary judgment granted on the basis that the plaintiff had not suffered antitrust injury. The defendant argued that the plaintiff had not shown that the relevant market was less competitive as a result of the defendant's conduct. The court disagreed: the antitrust injury requirement does not require the plaintiff to show actual harm to competition. Rather the plaintiff must show that it was injured by the anticompetitive aspects of the defendant's conduct. In other words, Flagship had to show only that its loss stemmed from the competition reducing aspects of the defendant's behavior. That the plaintiffs' injury would not impact market

conditions because the plaintiff was a relatively small market participant, did not foreclose the plaintiff from recovery. (*Id.* at p. 1380.)

Appellants' allegations of injury to competition in the crane operator training school marketplace are set forth in paragraph 99 of the third amended complaint. Specifically, they alleged respondents' activities severely constrained CCS, the largest crane school in California; the tuition prices charged to crane school candidates are higher and less competitive; there is less competition in the market, and the crane school market is subject to artificially inflated prices, noncompetitive services and related market damage. Appellants' allegations adequately alleged injury to competition to survive a demurrer.

### v. Market power

Respondents assert appellants failed to define a relevant market in terms of product or service and the complaint allegations showed that respondents did not have significant market power or market share in the relevant market. They also assert the crane school market and the crane operator certification market are separate and distinct as a matter of law, citing *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672 (*Exxon Corp.*).

The antitrust plaintiff must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly. (*Exxon Corp.*, *supra*, 51 Cal.App.4th at p. 1682.) Market power is generally equated with market share. It is usually inferred from possession of a substantial percentage of the sales in a market that is carefully defined in terms of product and geography. (*Redwood Theatres, Inc. v. Festival Enterprises*, *Inc*. (1988) 200 Cal.App.3d 687, 704.) The "relevant market" is composed of products that have reasonable interchangeability for the purpose for which they are produced. (*Exxon Corp.*, *supra*, 51 Cal.App.4th at p. 1682.) The relevant market may present a question of fact. (*Ibid*.)

Respondents submit the complaint demonstrated two separate markets as a matter of law—respondents are involved in crane operator certification and appellants are involved in crane operator training. Appellants submit the complaint alleged a single training and certification market because access to certification testing is an essential component to remaining competitive in the crane operator training school market. In *Knevelbaard*, *supra*, 232 F.3d 979, the case involving the milk producer/sellers and the cheesemaker/buyers, the court considered the defendant's contention that it was in one market (cheese) while the plaintiff was in another (fluid milk). The court concluded the complaint's allegations placed all parties in the milk market—the defendant as buyers and the plaintiff as sellers. Given the procedural posture of the case—a motion to dismiss for failure to state a claim on which relief could be granted—those allegations had to be accepted as true. (*Id.* at p. 989.) Similarly, in this case, appellants' allegations place all parties in one crane operator training and testing market. Further, we cannot determine as a matter of law on the allegations of the complaint whether the crane operator training market and the crane operator certification market are separate and distinct or not. Accordingly, respondents have not shown the complaint was legally insufficient regarding the market power allegations.

Respondents also submit the pleadings show respondents do not possess market power or market share in the relevant market in which appellants are active: crane operator training services. This argument hinges on the previous one—that the two markets are separate as a matter of law—and fails for the same reason. The parameters of the relevant market cannot be determined on the pleadings in this case. Market share in the as yet undefined relevant market presents a question of fact that is not amenable to resolution on demurrer.

The complaint allegations regarding market power, read liberally, were sufficient.[11]  The complaint alleged that NCCCO, together with its members, staff and commissioners, was the only entity providing the essential testing services that were required to compete in the crane operator training school marketplace.  As a result, respondents were able to eliminate competition in the crane operator training school marketplace.  Those allegations sufficiently alleged that respondents played enough of a role in the marketplace to impair competition significantly.

The third amended complaint allegations adequately set forth the elements of a cause of action for Cartwright Act violations.  Therefore, the court erred in sustaining the demurrer to the Cartwright Act violations/illegal trust cause of action.

### 3.     Adequate Reasons Stated for Sustaining the Demurrer

Appellants' final challenge to the adequacy of the reasons stated for sustaining the demurrer is moot in light of the reversal of the order.  Nevertheless, we note that the trial court's reasons were adequate.  While the court sustaining a demurrer is required to state the specific grounds for its decision, it is *not* required to give reasons for sustaining the demurrer on the specified grounds.  (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111.)  The trial court's explanation that the complaint failed to state facts sufficient to constitute a cause of action is an adequate specification of the ground.  It is not necessary to set forth the reasoning on which the ruling was made.  (*Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 943.)

---

[11]     In light of this conclusion, whether respondents provide an "essential service" within the meaning of the essential facilities doctrine, is immaterial.  (*Alaska Airlines, Inc. v. United Airlines, Inc.* (9th Cir. 1991) 948 F.2d 536, 542 [the essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first].)

## DISPOSITION

The order of March 24, 2010, sustaining respondents' demurrer to the Cartwright Act violation/illegal trust cause of action is reversed. The case is remanded to the trial court with directions to overrule respondents' demurrer to the Cartwright Act and illegal trust causes of action. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

_____
Kane, Acting P.J.

WE CONCUR:


_____
Poochigian, J.


_____
Franson, J.

70.